[No. S004665. Aug. 20, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
WARD FRANCIS WEAVER, JR., Defendant and Appellant.

878

880

**COUNSEL**

Marvin Rous and Mark Farbman, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Jane N. Kirkland, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—Ward Francis Weaver, Jr., was convicted in 1984 in Kern County Superior Court of the first degree murders of Robert Radford and Barbara Levoy. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) The jury also sustained a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)) and two kidnapping-murder special-circumstance allegations (§ 190.2, former subd. (a)(17)(ii), now redesignated (17)(B)). In addition, the jury convicted defendant of kidnapping Levoy (§ 207) and sustained an enhancement allegation that defendant had used a deadly weapon in murdering Radford (§ 12022, subd. (b)). Defendant subsequently admitted he had served a prior prison term (§ 667.5, subd. (b)). After finding defendant sane following a separate sanity hearing, the jury considered evidence presented at the penalty phase of the trial. On March 7, 1985, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

After considering the claims raised on appeal, we affirm the guilt, sanity, and penalty judgments in their entirety.

## I. GUILT PHASE

### A. *Facts*

Robert Radford, 18 years old, was assigned to basic training for the United States Air Force in Colorado. While there, he met 23-year-old

Barbara Levoy. When Radford completed his training, he traveled to his home in Edmonds, Washington, and Levoy accompanied him to meet his parents. The couple then drove south to Pinedale, California (near Fresno) to meet Radford's grandmother. The couple's ultimate destination was Las Vegas, Nevada, where Radford would begin his first tour of duty at Nellis Air Force Base. Levoy planned to fly home to Colorado from Las Vegas.

Radford and Levoy arrived in Pinedale on the afternoon of February 5, 1981, and visited with Radford's grandmother. They left Pinedale around 7:00 p.m. the same day, anxious to get to Las Vegas. Unfortunately, their car broke down one mile east of Tehachapi. James Powell was coming home from work around 11:00 p.m. and encountered Radford, his disabled car on the side of the road with its emergency lights flashing. Powell saw a young woman in the car. He offered the couple a ride back to Tehachapi, but Radford declined because it was in the opposite direction from which he was traveling. Powell left.

Our knowledge of what happened next derives from defendant's admissions to a cellmate, Ricky Gibson, defendant's tape-recorded interviews with police, and defendant's testimony at trial. Around 10:00 p.m., defendant, who was working as a long-haul trucker, saw Radford's car on the side of the road as he drove by in the opposite direction.[1] Defendant exited the highway and circled back to offer his assistance. Radford and Levoy accepted his offer to drive them to Mojave. After driving about five miles, defendant pulled over and asked Radford to help him shift the load on the flatbed of his truck. Levoy stayed in the cab. While Radford was bent over with his back turned, defendant struck him on the back of the head with a "cheater pipe," a three- to four-foot length of metal pipe truckers use to gain leverage when tightening the bindings that restrain a load on the truck. A later autopsy revealed 11 separate lacerations to Radford's head.

Defendant rejoined Levoy in the truck cab, displayed a knife, and had her sit with her head between her legs and her hands behind her, a technique defendant had learned when transporting prisoners during his military service in Vietnam. Defendant reversed direction and drove to Bakersfield; near Kettleman City, he stopped and raped Levoy. He then drove towards San Francisco, pulled off the highway once more and again raped Levoy.

Meanwhile, a citizen reported having seen Radford on the side of the road where defendant had left him. Police responded to the scene and attempted

---

[1]Asked why he stopped to help, defendant explained that he had plenty of time because he did not have to be in San Francisco to deliver his load until 8:00 a.m. the next morning. The way defendant expressed it, however, proved prophetic and chilling: he said he stopped to help because "I had some time to kill."

to keep Radford alive, but he died on the way to the hospital. Police found a large amount of blood at the crime scene. At the hospital, Radford's wallet, with his Washington State driver's license, was found, allowing police to link Radford to the disabled car a few miles away. The car contained a woman's purse and several pieces of luggage. Correctly surmising that Radford had been traveling with a woman, police forced open the car and discovered identification belonging to Levoy. Police then issued a missing person report and organized a search effort to find her. Their efforts came too late to save Levoy.

After he deposited his cargo in San Francisco, defendant drove towards his home in Oroville. At a secluded spot outside that town, he stopped and asked Levoy to get out of the truck. He tied her hands and feet with electrician's tape, but when he attempted to gag her, Levoy struggled and bit defendant severely on the thumb. He then strangled her. He dug a grave and buried Levoy's body there before driving into town to meet his wife, who was working a late shift in a local restaurant. It was suggested defendant move the body, so defendant took his wife's car and returned to the grave, exhumed the body, put it in the trunk of the car and drove home. When he arrived, defendant's three children were awake and asked him about his bloody thumb. He told them he had gotten in a fight and that they should stay in the house because his assailant might come looking for him.

With the children in the house, defendant moved Levoy's body from the car to a shallow grave dug in his backyard. Defendant previously had begun digging trenches in his yard for a sewer line and had instructed his 10-year-old son and another boy to keep working on the digging project while he was away driving his truck. Some weeks later, defendant exhumed Levoy's body again and moved it to a deeper grave elsewhere in his yard. He then built a wooden platform over the grave so his wife could stand on it and hang out the laundry without getting her feet wet in the grass.

Police were stymied in their attempt to solve Radford's murder and Levoy's disappearance. Then, 17 months after the crimes, prison inmate Ricky Gibson contacted authorities and reported that defendant, who was serving time in prison for subsequent unrelated (but similar) crimes, had told him the story of how he killed Radford and raped and killed Levoy.

Police went to defendant's home in Oroville, interviewed defendant's wife and son, and obtained consent to search the yard. Defendant's son directed police to the platform, which they removed and discovered Levoy's badly decomposed body. She was identified through her dental records. In addition, the body bore the same clothes Levoy had been wearing when she disappeared, with the exception that her panties were missing.

An autopsy of Levoy's body yielded no clues about the cause of her death, due to the advanced state of decomposition. Some electrician's tape, however, was found stuck to the collar of her shirt.

Police proceeded to interview defendant at San Quentin State Prison. He agreed to waive his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]) if he could first speak to his mother. Police agreed. After speaking with his mother, he agreed to talk to police. In two tape-recorded interviews, defendant admitted he had killed Radford and Levoy, and that he had raped Levoy. He drew a map of the place in rural Oroville where he had first buried Levoy. Following the map, police found an indentation in the ground where defendant said he had dug the first grave; police also found some black electrician's tape on the ground nearby.

Defendant testified at trial. He claimed he had heard the voice of a female named Ladell in his head since he was 17 years old. He first heard a competing unnamed male voice when he served in Vietnam in 1968 and 1969. He trusted the male voice because it had warned him of danger in Vietnam and saved his life. Defendant explained that he often used amphetamines to stay awake while driving his truck, had taken amphetamines the day of the crimes and, at the time he killed Radford, had not slept in a week and a half.

When he picked up Radford and Levoy, he noticed how attractive Levoy was and became sexually aroused. The male voice started saying he should have sex with Levoy. Ladell told him to leave Levoy alone. The male voice assured him he would not get in trouble if he raped Levoy. Defendant testified, "I just couldn't go against him. I just couldn't help it. Had to go along with what sounded like the most logical thing to do." The male voice said to knock Radford out so he could be alone with Levoy. Defendant decided to follow the male voice, but did not think Radford would die because defendant had assaulted someone with the "cheater pipe" in 1977 and the victim did not suffer serious injury. Defendant said that if he had wanted to kill Radford, he would have used the knife he kept in the truck or used some other, more silent means of killing that he had learned in the military.

Defendant testified that when he hit Radford, the young man fell off the truck screaming. Defendant told him to "shut up" and when he did not, defendant struck him "a couple" of times with the pipe, taking full swings with both hands on the pipe. He did not check to see if Radford was alive or dead; he just assumed Radford was "out." He then rejoined Levoy in the

truck, displayed his knife, and started driving. The voice named Ladell was chastising him while the male voice was telling him to ignore Ladell. When they approached Kettleman City, the male voice reminded defendant to have sex with Levoy. He pulled over around 4:00 a.m., displayed his knife again, and then raped Levoy. He then drove north towards San Francisco. About an hour later, he pulled over and raped Levoy again.

Defendant claimed he did not intend to kill Levoy and, after the second rape, was looking all along the route for a safe yet deserted place to drop her off. As it began to get light, he abandoned this plan and took her to the Bay Area with him. He instructed Levoy to sit on the floor of his truck while he delivered his load. She obeyed, sitting quietly in the truck for 45 minutes. He then drove to Oakland to pick up another load for a local delivery. Defendant was stopped on the way to Oakland by a California Highway Patrol officer, but Levoy complied with defendant's instructions and did not call out to the officer or try to escape. After stopping in Oakland, defendant drove home to Oroville, taking a long and winding route.

Defendant stopped four miles outside of Oroville. By now it was about 11:00 p.m. on February 6, 1981. Defendant told Levoy he would tie her up and leave her under a bridge, coming back the next day when he was scheduled to drive to Southern California. He would then release her in Los Angeles in a warehouse district. He bound her with electrician's tape, but when he tried to gag her with some fabric diapers, she struggled and bit him on the thumb and would not let go. Defendant testified he twice hit her with his fist and then he blacked out and began jerking the diaper around Levoy's neck. He stopped when he realized she was no longer biting him. She slumped over; defendant at first thought she was unconscious but then determined she was dead. He cried and asserted he had never intended to kill her, even when she bit him. The male voice told him to get rid of the evidence. As indicated, he buried her where he killed her, then exhumed her body twice before finally burying her in his yard.

The next morning, on February 7, 1981, Thomas Jenkins, an insurance adjuster, met with defendant and noticed facial abrasions and scratches, as well as a white bandage on his hand. Defendant said his thumb had been almost bitten off by another trucker.

Defendant's first wife, Patricia Budrow, testified that defendant hates to be bitten. She testified she once bit his hand when they were wrestling in the car and he became very angry and began choking her. Another time, she bit his hand when they were wrestling on the floor. He grabbed her by the neck and looked dazed and glassy-eyed. He later told her he did not know why he

choked her, but that he hated being bitten, and that when he was a child his mother would bite him until he bled as a means of disciplining him. Budrow also testified that defendant's mother confirmed the story and suggested Budrow use the same method to train her children.

B. *Discussion: Pretrial Issues*

1. *Submission of Competency Determination on the Psychiatric Reports*

On September 29, 1982, before defendant was arraigned, his defense counsel expressed a doubt as to defendant's present competence. The trial court agreed and appointed two psychiatrists, Dr. Paul Cutting and Dr. Francis Criswell, to examine defendant. The proceedings were suspended until the two doctors could examine defendant and file their reports with the court. On October 27, 1982, the court was in possession of the reports of both doctors. Both found defendant was legally competent. Defense counsel and the prosecutor submitted the question of defendant's competence on these two psychiatric reports, and the trial court found defendant competent. The proceedings then resumed.

Defendant contends the failure to hold a full-blown adversarial hearing on the question of his competence deprived him of due process and requires that we vacate his convictions. Essentially, defendant claims counsel could not waive a full jury trial with live witnesses. We rejected this precise claim in *People v. McPeters* (1992) 2 Cal.4th 1148, 1169 [9 Cal.Rptr.2d 834, 832 P.2d 146]: "Section 1368 entitles defendant to a 'hearing' on the issue of competence and he received one. Although defendant's counsel, for under-standable reasons, elected to waive certain available incidents of the hearing procedure, i.e., the right to jury trial and the rights to present oral testimony and to confront and cross-examine witnesses, defendant presented evidence and received an independent judicial determination of his competence to stand trial based on the stipulated record. [Citation.] [¶] Defendant cites no authority holding that submission to the court of the issue of competence to stand trial based on psychiatric reports is per se unconstitutional or a violation of statute."

Of course, trial of an incompetent defendant violates an accused's right to due process. (*Medina v. California* (1992) 505 U.S. 437, 448 [112 S.Ct. 2572, 2578-2579, 120 L.Ed.2d 353]; *Pate v. Robinson* (1966) 383 U.S. 375, 378 [86 S.Ct. 836, 838, 15 L.Ed.2d 815]; *People v. Hale* (1988) 44 Cal.3d 531, 539 [244 Cal.Rptr. 114, 749 P.2d 769]; *People v. Pennington* (1967) 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942].) But contrary to defendant's

arguments, neither *Hale* nor any of our other precedents precludes a defense attorney from waiving a jury, forgoing the right to present live witnesses, and submitting the competency determination on the psychiatric reports filed with the court. The statutory references to a "hearing" (§ 1368, subd. (b)) or a "trial" (§ 1369) simply mean that a determination of competency must be made by the court (or a jury if one is not waived), not, as defendant contends, that there must be "a court or jury trial, at which the criminal defendant's rights of confrontation, cross examination, compulsory process and to present evidence are honored by the court and counsel." Unlike in *People v. Marks* (1988) 45 Cal.3d 1335, 1343 [248 Cal.Rptr. 874, 756 P.2d 260], defense counsel did not attempt to waive the competency issue; he merely submitted the matter on the psychiatric reports.

To the extent defendant attempts to impugn the validity of the appointed experts' conclusions on grounds they failed to consider the effect of defendant's medication on his competency, the time to raise such a challenge has long since passed. Having submitted the competency determination on the two psychiatric reports, defendant may not now relitigate that question with arguments he did not make below. We also reject the further claim that defense counsel was constitutionally ineffective under the state and federal Constitutions for waiving a jury trial and submitting the matter on the reports. We have examined the reports and conclude counsel's decision against challenging the conclusions therein was a reasonable one.[2]

Defendant cites two appellate opinions in support, but neither assists him. To the extent defendant contends *Moore v. United States* (9th Cir. 1972) 464 F.2d 663, 666, indicates the Ninth Circuit Court of Appeals applies a per se reversal rule to a competency determination submitted on medical reports rather than pursuant to a full-blown jury trial, we agree with respondent that defendant misconstrues the federal appellate court's position on this issue. (*Greenfield v. Gunn* (9th Cir. 1977) 556 F.2d 935, 939 [submission of competency question on doctor's reports permissible].) Finally, *People v. Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622], also cited in support, is manifestly distinguishable; *Ramirez* concerned the procedural due process that must be afforded before an inmate can be excluded from the California Rehabilitation Center. *Ramirez* sheds no light on whether a defense attorney validly may waive the trial authorized by section 1369 and submit the competency determination on the psychiatric reports.

---

[2]To the extent defendant contends that evidence of his mental condition, adduced at the time of the sanity phase of the trial, supports the conclusion he was incompetent at the time of arraignment, we note the sanity phase occurred years after the October 1982 competency hearing, and the record does not indicate that the evidence produced at the sanity hearing was available earlier.

In sum, we have already decided a defense attorney may validly submit a competency determination on the available psychiatric reports (*People v. McPeters, supra,* 2 Cal.4th at p. 1169), and defendant fails to persuade us *McPeters* was decided incorrectly. We thus reject this claim, finding no error under section 1368, no violation of either the state or federal Constitution, and no showing counsel was constitutionally ineffective for deciding to submit the competency determination on the psychiatric reports.

### 2. *Change of Venue*

 Citing prejudicial pretrial coverage of his trial in the local media, defendant moved for a change of venue from Kern County. In support, he submitted to the trial court a survey of public opinion about the case and 12 articles from the Bakersfield Californian, the area's major newspaper. After a hearing, the trial court denied the motion. Defendant now claims the trial court erred.

 The applicable principles are settled. A trial court should grant a change of venue when the defendant demonstrates a reasonable likelihood that in the absence of such relief, he cannot obtain a fair trial. (*People v. Jennings* (1991) 53 Cal.3d 334, 359 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People v. Williams* (1989) 48 Cal.3d 1112, 1125 [259 Cal.Rptr. 473, 774 P.2d 146].) On appeal, "we make an independent determination of whether a fair trial was obtainable." (*Jennings, supra,* at p. 360; *People v. Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].) To make that decision, we examine five factors: the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. (*People v. Douglas* (1990) 50 Cal.3d 468, 495 [268 Cal.Rptr. 126, 788 P.2d 640].)

 Because this is a capital case and a double murder, the nature and gravity of the offense tilts strongly in favor of granting a change of venue, although this factor is not dispositive. (*People v. Jennings, supra,* 53 Cal.3d at p. 360.) The size of the community is relatively neutral; as defendant asserts, Kern County is "neither large nor small." At the time of trial, the county had a population exceeding 450,000 and Bakersfield, where the trial was held, had a population of 200,000. The key consideration is "whether it can be shown that the population is of such a size that it 'neutralizes or dilutes the impact of adverse publicity.' " (*Jennings, supra,* at p. 363, quoting *Lansdown v. Superior Court* (1970) 10 Cal.App.3d 604, 609 [89 Cal.Rptr. 154].) As explained, *post,* the adverse publicity in this case was neither relentless nor virulent. The moderate size of Kern County thus does not undermine the trial court's decision to deny the change of venue motion.

Both defendant and the victims were strangers to the community, and neither held any position of prominence or popularity. Although defendant argues the fact that the victims were a young couple starting their life together and were "religious, church-going people" necessarily enhanced their status in the community, nothing in the record suggests these factors had any effect on the jury pool.

The nature, extent, and penetration of the news coverage, especially from the Bakersfield Californian, was the most heavily litigated of the five factors. Defendant contends the press coverage "flowed evenly for months, was vituperative in nature, pandered to base instincts, and referred to innuendoes that never proved true but which severely prejudiced [defendant]." By contrast, respondent argues "[t]he coverage of the murders in the newspaper in question was factual, not sensational." The truth lies somewhere between these two characterizations.

Defendant submitted 12 articles from the Bakersfield Californian. They ranged from a short mention on February 7, 1981, of Radford's murder and Levoy's disappearance (*Man Found Beaten To Death On Desert Highway*), to an article on July 28, 1982, reporting that defendant had been linked to the crimes (*San Quentin Inmate Linked To Kern Homicide Victim*), to a June 7, 1983, article describing defense attorney's request for a pretrial gag order (*Gag Order Asked In Murder Trial*). The period of time in which the 12 articles were published was 29 months, hardly a flood of information. Jury selection began on October 9, 1984, 16 months after publication of the last article submitted by defendant. This interval suggests that any possible prejudice flowing from the press coverage was blunted by the passage of time.

With two significant exceptions, the 12 articles are largely factual and not sensational, although the reader is naturally swayed by reports of the anguish of the victims' friends and relatives. Two articles went beyond mere factual reporting. On August 12, 1982, the Bakersfield Californian published an article bearing the headline *Suspect Expresses Regret At Raping Virgin*. The article noted Levoy was "good-looking," a Mormon, and a virgin. Defendant was reported as regretting raping her because "he thought that meant she wouldn't go to heaven." The same article noted that in addition to the two murders and kidnapping, defendant was charged with rape, sodomy, and oral copulation, charges that were later dropped.

Then, on Sunday, May 29, 1983, the main headline on the front page of the Bakersfield Californian stated, *Man Boasts About His Killings*; the subheading read, *Trucker Suspected In Rapes, Murders Of Two Dozen Hitchhikers*. The article reported on revelations from "court documents" that defendant had told cellmate Ricky Gibson that "although it takes a long time to

strangle someone, it's exciting, very exciting, to watch a woman turn blue after she has taken her last breath." (Defendant later testified at trial he generally exaggerated his crimes to Gibson to appear more dangerous and intimidating, and that he did not realize he was strangling Levoy, but blacked out when she bit him. He specifically denied telling Gibson that he liked to watch women turn blue when they were dying.) The article continued, reporting that "law enforcement officers in seven states suspect [defendant] may be involved in as many as two dozen hitchhiker homicides," including "numerous rapes." Defendant has not, however, been charged with or convicted of any other hitchhiker-related crimes, with the exception of his crimes against David Galbraith and Michelle D., discussed *post*, which occurred after Radford's and Levoy's murders.

The same article reported that in one incident, when defendant drove off with Michelle D. and raped her, he "kept her for several days, raping and sodomizing her in the sleeper compartment of his truck-trailer rig as he drove to his home in Oroville. [¶] He locked her in the closet in Oroville, taking her out only for sex." This lurid tale proved largely untrue, as the victim's own testimony at the penalty phase shows.

In short, neither defendant's nor respondent's characterization of the publicity leading up to the trial is accurate. Two newspaper articles that went well beyond mere factual reporting created a potential for prejudice. These articles emphasized the more sensational aspects of the case, aspects that the evidence presented at trial showed were either not true or not proved. Did publication of these two articles tip the balance, requiring the trial court to grant defendant's motion for a change of venue?

We conclude they did not. Although the potential for prejudice was certainly present, almost 17 months had elapsed from the time of the most inflammatory article to the commencement of jury selection. More importantly, the evidence of public opinion presented by defendant's own expert demonstrated that the effect of the two sensationalistic articles was minimal. Defendant employed Terry Newell, Ph.D., a licensed psychologist, to conduct a poll of public opinion. Of 377 persons contacted at random, only 187, or 53 percent, had even heard of the case. Of those 187 persons, only 18 percent recalled defendant was suspected of crimes in other states, 14 percent thought their knowledge of the case would affect their verdict if they were to serve on defendant's jury, and 17 percent already thought he was guilty. The survey, moreover, was conducted on July 22-24, 1983, more than a year before jury selection began. Because the record does not indicate additional articles were published, we assume the public's recollection of the case diminished over time.

Examination of the voir dire proceedings also supports the conclusion that pretrial publicity failed to penetrate the public's consciousness to such an extent as to compromise defendant's ability to obtain a fair trial. Although many prospective jurors averred they recalled something about the case, the vast majority assured the court they could set aside their impressions and judge the case fairly. Although defendant emphasizes the number of prospective jurors who recalled something about the case, jurors need not be wholly ignorant of the facts of a case. It is sufficient if the jurors can, as here, assure the court they can set aside their prior impressions and render a decision based solely on the evidence presented in court. (*People v. Bean* (1988) 46 Cal.3d 919, 941 [251 Cal.Rptr. 467, 760 P.2d 996].)

In sum, although the gravity and nature of the crime support a change of venue, the size of the community is a neutral factor, and the status of both defendant and his victims in the community supports a denial of a change of venue. The critical factor, the extent and nature of the pretrial publicity, was—considering the totality of the evidence—mildly supportive of a denial of a change of venue despite the publication of two potentially prejudicial articles. Weighing all these factors, we conclude the trial court correctly denied the motion.[3]

### 3. *Failure to Admonish the Prospective Jurors*

██ In preliminary proceedings, the court organized the jury pool into groups, telling certain prospective jurors to return for voir dire after lunch, while assigning others future times and days in which they were to return to court for voir dire. Before the latter jurors left the courtroom, the trial court did not admonish them against discussing the case, reading or listening to media accounts, or visiting the scene of the crimes. Defendant acknowledges that the statutory requirement that jurors be admonished (§ 1122) applies only after a jury is sworn and thus does not expressly apply to this preliminary period in the jury selection process. (*People v. Horton* (1995) 11 Cal.4th 1068, 1094 [47 Cal.Rptr.2d 516, 906 P.2d 478].) Nevertheless, he contends the trial court's failure to admonish the jury violated his federal constitutional rights to a fair trial, an impartial jury, and a reliable guilt and penalty verdict, as well as his analogous rights under the state Constitution.

---

[3]We reject defendant's further contention that the short amount of time the jury deliberated before reaching a guilt verdict (195 minutes), a sanity verdict (42 minutes), and a penalty verdict (150 minutes) demonstrates "more than a reasonable likelihood that the prejudicial pretrial publicity deprived [him] of his due process right to a fair trial." This was a case, after all, in which defendant essentially confessed to the crimes and committed an equally reprehensible set of crimes against similarly vulnerable victims (David Galbraith and Michelle D.) just months after his attacks on Radford and Levoy. Hence, even in the absence of any publicity, a relatively short deliberation time, based on the evidence presented, would not have been unexpected.

We have explained that "the giving of the admonition to prospective jurors during the voir dire process constitutes a sound judicial practice" (*People v. Horton, supra*, 11 Cal.4th at p. 1094), but that failure to do so does not constitute error. Because our *Horton* opinion makes no mention of whether we considered all the constitutional bases defendant now asserts, *Horton* does not fully dispose of defendant's claim. We nevertheless find three reasons why the claim is meritless.

First, defendant failed to object or call the trial court's attention to the lack of an admonishment. The issue is thus forfeited on appeal. (Cf. *People v. Heishman* (1988) 45 Cal.3d 147, 175 [246 Cal.Rptr. 673, 753 P.2d 629] [where § 1122 applies, a timely objection is necessary].) Second, even assuming the issue were preserved for appeal, we are unaware of any constitutional requirement that our trial courts admonish prospective jurors so far in advance of a trial. Certainly defendant does not cite any authority to that effect.

Third, any prospective jurors who discuss the case, form opinions, view the crime scene, or do legal research can be discovered during the voir dire process and be either excused or rehabilitated at that time. Although defendant directs our attention to a few jurors who may have acquainted themselves with the law after being notified they might be chosen for the jury, he fails to explain why his right to a fair trial and an impartial jury could not be protected by rehabilitating those jurors or excusing them for cause or peremptorily if they could not be rehabilitated. He thus fails to show prejudice. (*People v. Heishman, supra*, 45 Cal.3d at p. 175.) Defendant's ability to strike such jurors also protects his rights under both the state and federal Constitutions to a reliable verdict.

Defendant also contends his trial attorney provided ineffective assistance of counsel by failing to ask the court to admonish the prospective jurors. He claims his counsel could have had no conceivable tactical reason for the omission. Even assuming that to be true, defendant fails to demonstrate how he was prejudiced. Accordingly, he does not show his trial attorney was constitutionally ineffective under either the state or federal Constitution. (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164]; *Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [104 S.Ct. 2052, 2066-2067, 80 L.Ed.2d 674].)

4. *Failure to Excuse Jurors for Cause*

During voir dire, two venirepersons questioned by defense counsel expressed the general belief that the death penalty was the appropriate

penalty for all murders. Defendant challenged the prospective jurors for cause. In each instance, the prosecutor questioned the prospective juror and rehabilitated him somewhat. The trial court denied defendant's challenges for cause, leading defendant to excuse each venireperson by exercising a peremptory challenge. Defendant now contends the trial court's failure to excuse the two prospective jurors for cause violated his rights under the state and federal Constitutions. We disagree.

■ The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence. (*People v. Crittenden* (1994) 9 Cal.4th 83, 120-121 [36 Cal.Rptr.2d 474, 885 P.2d 887].) "[A] juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*Id.* at p. 121, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) If the death penalty is imposed by a jury containing even one juror who would vote automatically for the death penalty without considering the mitigating evidence, "the State is disentitled to execute the sentence." (*Morgan v. Illinois* (1992) 504 U.S. 719, 729 [112 S.Ct. 2222, 2230, 119 L.Ed.2d 492].)

Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146 [36 Cal.Rptr.2d 235, 885 P.2d 1].) The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case." (*Id.* at p. 1147.) A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. (*Ibid.*) "[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court. [Citations.]" (*People v. Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250].)

■ Applying these rules to this case, we conclude the trial court did not abuse its discretion in denying defendant's two challenges for cause. At the threshold, we note that a defendant challenging on appeal the denial of a challenge for cause must fulfill a trio of procedural requirements: (1) the

defense must exercise a peremptory challenge to remove the juror in question; (2) the defense must exhaust all available peremptory challenges; and (3) the defense must express dissatisfaction with the jury as finally constituted. (*People v. Crittenden, supra,* 9 Cal.4th at p. 121.) In this case, defense counsel moved to excuse Prospective Jurors B.M. and F.M. for cause, each challenge was denied, and counsel exercised a peremptory challenge to remove each juror. Counsel subsequently exhausted the 26 peremptory challenges then granted by statute. (Pen. Code, former § 1070, subd. (a), repealed by Stats. 1988, ch. 1245, § 30, p. 4155; see now Code Civ. Proc., § 231, subd. (a), added by Stats. 1988, ch. 1245, § 2, p. 4152 [granting each side 20 peremptory challenges in a capital case].)

Defense counsel failed, however, to express on the record his dissatisfaction with the jury. Defendant concedes as much. Accordingly, the issue was not preserved for appeal, as it is possible that counsel, despite initial misgivings, was ultimately satisfied with the overall composition of the jury. Also possible is that, had counsel expressed dissatisfaction, the trial court would have allowed him to exercise additional peremptory challenges. (See *People v. Bittaker* (1989) 48 Cal.3d 1046, 1087 [259 Cal.Rptr. 630, 774 P.2d 659].)

Although a procedural obstacle thus exists to reaching this issue on appeal, we do not, for several reasons, rest our decision solely on this procedural lacuna. First, language in past cases suggested that counsel's expression of dissatisfaction with the jury was not always a necessary prerequisite to challenging on appeal a trial court's decision denying a challenge for cause. (E.g., *People v. Crittenden, supra,* 9 Cal.4th at p. 121, fn. 4.) Second, defendant argues it is "inconceivable" that counsel was satisfied with the jury, as it contained one juror with strong ties to the law enforcement community who stated on voir dire that he believed the death penalty was warranted for any premeditated murder. Third, because the presence of even a single juror compromising the impartiality of the jury requires reversal, counsel would be constitutionally ineffective if he had failed to voice dissatisfaction with the jury as constituted, all the while knowing a biased juror was sitting among the 12 seated jurors. We thus turn to the merits.

a. *Juror B.M.*

Juror B.M., a refinery worker, professed knowing almost nothing about the case. He informed the court that he could impose either the death penalty or a life sentence without the possibility of parole, depending on all the evidence he heard. But when defense counsel Donnalee Huffman asked him

his views concerning the death penalty, Mr. B.M. stated that, "as a taxpayer, I am personally in favor of it." He admitted he was more apt to impose a sentence of death over life imprisonment and, when asked whether there was "any other way that you could vote," he replied, "I don't believe so."

The prosecutor, Ronald Shumaker, then explained to the juror the penalty phase process, with the People presenting aggravating evidence and the defense presenting mitigating evidence. He further explained that the trial court would instruct the jury to weigh the two sides before coming to a decision on the appropriate penalty. The following then occurred:

"Q [Mr. Shumaker] Could you, if the Court instructs you in that regard, follow those instructions and make a decision on that kind of a standard?

"A [Juror B.M.] Yes, on that standard, yes.

"Q Even though you may feel that the life without parole is an expensive process, you could still render that decision if in fact you felt that the factors favoring [a life term] outweighed those favoring the death penalty?

"A Yes, I could."

This record indicates that although Juror B.M. initially expressed the view he would automatically vote for the death penalty, when informed of the penalty phase process he retracted that rigid position and professed a willingness and ability to follow the trial court's instructions to weigh all the evidence before coming to a penalty decision. The trial court obviously credited this latter testimony in denying the challenge for cause. Substantial evidence supports the trial court's factual determination. We thus find no abuse of discretion in the court's denial of the challenge to Juror B.M. for cause.

b. *Juror F.M.*

When questioned by the trial court, Juror F.M. affirmed his ability to vote for life imprisonment without the possibility of parole if, based on all the facts, it was the appropriate penalty. He could also vote for the death penalty. When questioned by cocounsel for the defense, Donnalee Huffman, however, Juror F.M. stated that "if a person's life is taken and he is found guilty, then he should be sentenced to death." When asked whether "every murder conviction should be given the death penalty," Juror F.M. replied, "Well, I think so, yes, murder conviction, yes." He admitted he was "death penalty prone" and that he believed the death penalty was the proper

925punishment "in almost every situation." He also stated, however, that he could consider sympathy and mercy and that to vote for a life sentence, he would look for mitigating factors such as medical and psychiatric testimony. He several times averred he would have to hear the evidence from the entire case before making up his mind.

Mr. Shumaker explained to the juror the penalty phase process, including the necessity of weighing the aggravating and mitigating evidence, and asked him whether, "[i]f the Court tells you that that's the law and the instruction you are to follow in this case, do you feel that you could do that?" He replied, "Yes, life without parole, yes." He also affirmed that he could judge both sides of the issue by "the same standard."

As with Juror B.M., the record indicates that although Juror F.M. initially asserted that he would automatically vote for the death penalty, he modified his view when informed by the prosecutor of the penalty phase process. He then affirmed his willingness and ability to follow the trial court's instructions to weigh all the evidence before coming to a penalty decision. We cannot say the trial court's decision to credit these statements was made in the absence of substantial evidence, or that its decision to deny the challenge for cause was an abuse of discretion.

In the alternative, defendant argues the trial court's erroneous denial of his two challenges for cause forced him to excuse Jurors B.M. and F.M. by exercising two of his peremptory challenges, thereby infringing on his federal constitutional right to a state-created liberty interest in his full statutory complement of peremptory challenges. He claims he should not be forced to surrender one constitutional right (his asserted state-created liberty interest in a full complement of peremptory challenges) to vindicate another constitutional right (his right to a jury free from biased jurors). We rejected this argument in *People v. Gordon* (1990) 50 Cal.3d 1223, 1248, footnote 4,[4] [270 Cal.Rptr. 451, 792 P.2d 251], and defendant does not convince us we should reconsider that decision.

We conclude defendant failed to preserve this issue for appeal, and that even if the issue were properly before us, he does not demonstrate the trial court abused its wide discretion when it denied his challenge to Jurors B.M. and F.M. for cause. Moreover, because neither prospective juror actually sat on defendant's jury, he was not deprived of his constitutional right to an impartial jury. (*Ross v. Oklahoma* (1988) 487 U.S. 81, 86 [108 S.Ct. 2273, 2277, 101 L.Ed.2d 80].)

---

[4]*People v. Gordon, supra,* 50 Cal.3d 1223, was overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436].

## C. *Discussion: Trial Issues*

### 1. *Miranda*

 The information Ricky Gibson provided police regarding defendant's inculpatory statements about the murders of Radford and Levoy led to the discovery that Levoy's body was buried in defendant's backyard. This in turn led police to defendant, who was at that time serving a sentence for unrelated crimes in San Quentin State Prison. Police spoke to defendant on July 27 and 28, 1982, and on August 2, 1982. The interviews on the latter two dates were tape-recorded. In those interviews, defendant essentially confessed to the crimes of which he now stands convicted. He claims on appeal that admission at trial of his statements to police on those dates violated his rights under the state and federal Constitutions. His primary claim is that police violated his rights as set forth in *Miranda v. Arizona*, *supra*, 384 U.S. 436 (*Miranda*). As we explain, he is mistaken.

#### a. *The facts*

Sergeants Gary Davis and Glen Johnson of the Kern County Sheriff's Department testified they went to San Quentin State Prison on July 27, 1982, to speak to defendant about a double homicide. Prison officials placed the two officers alone with defendant in the security squad office. Sergeant Davis testified that at the beginning of the 30-minute interview, he advised defendant of his *Miranda* rights, reading from a preprinted form from the sheriff's office. Defendant replied verbally that he understood his rights and would speak with the officers.

In this first interview, defendant stated he was not involved in the homicides. Sergeant Davis advised defendant that this was his chance to talk to them, but that they would be filing a report with the district attorney's office for a possible complaint against defendant charging him with the murders. Davis also told defendant he already had spoken with defendant's wife, son, mother, and father about the crimes. Defendant then told Davis he wished to speak with his mother and that, after doing so, he would advise Davis whether he wished to continue their conversation. Defendant then requested that the interview cease, and the officers withdrew. According to Sergeant Davis, defendant appeared alert and coherent, and his answers were responsive to Davis's questions. At no time did he indicate a desire to have an attorney present. Following this first interview, Davis called defendant's parents' home and informed his father that defendant wished to speak to his mother.

Sergeant Davis did not tape-record this first interview because he was not allowed to enter the prison with his recording equipment, as the prison was

in full lockdown due to an in-prison disturbance. At the end of the interview, he spoke with prison officials about his inability to record the interview with defendant. The prison offered Davis the use of its own recording equipment should he return for future meetings with defendant.

The next day, July 28, 1982, Davis and Johnson returned to the prison in the morning but were unable to see defendant because he was meeting with his mother. The officers eventually met with defendant in the afternoon, again in a security squad office. This second interview was tape-recorded using the prison's recording equipment. Davis testified that he again read defendant his *Miranda* rights and defendant again stated he understood his rights and wished to speak to the officers. He told the officers that he wanted to make a statement and would do so whether an attorney was present or not, and that he later wanted to testify in court about how he had committed the homicides. Sergeant Davis denied threatening defendant or promising him any benefits should he decide to speak with them. The officers promised only to listen to defendant's entire story. During this second interview, defendant admitted his involvement in the Radford and Levoy murders. Defendant did not appear drowsy or sleepy, and his answers were responsive to the officers' questions.

On cross-examination, Sergeant Davis specifically denied threatening to arrest defendant's son if defendant refused to talk to them, denied threatening to arrest someone close to defendant's family, and denied saying that he would not have defendant's mother come to see him if defendant would not, afterwards, agree to talk to police. Davis stated he advised defendant of his rights on the second day while the tape recorder was running and did not advise him of his rights before the tape recorder began. He repeated that defendant did not appear drowsy and that defendant's speech was not slurred or slow.

Sergeant Glen Johnson essentially confirmed Sergeant Davis's testimony. Johnson specifically corroborated Davis's testimony that Davis had read defendant his *Miranda* rights before the interviews on July 27 and 28, 1982, and that defendant did not appear sleepy or otherwise under the influence of drugs, although Johnson recalled defendant had said he was "sedated."

Sergeant Johnson further testified that he alone conducted a third interview with defendant on August 2, 1982. The interview occurred in the same place as the first two interviews. Johnson read defendant his *Miranda* rights from a card and obtained defendant's agreement to talk. During this third interview, defendant appeared fully aware of his surroundings and did not exhibit any excessive movements or unusual perspiration. He was alert and

responsive. Sergeant Johnson testified he did not threaten to arrest defendant's son or other family members. He did not recall hearing defendant say anything about wanting an attorney present.

The defense called defendant's mother, Dorothy Weaver, to the stand. She testified she had just visited her son in late July when police visited her and informed her of defendant's possible involvement in the Radford and Levoy murders. She decided to visit him again to hear the truth; she denied police contacted her by telephone. She drove to San Quentin the next day with defendant's sister, Katie S. When Mrs. Weaver spoke to defendant, he told her police had informed him that if he did not cooperate, they would arrest his son as well as another close loved one. His sister told defendant he should consult an attorney before speaking with the police, but Mrs. Weaver simply urged defendant to tell the truth.

The defense then called Katie S. to the stand. She confirmed her mother's testimony regarding their visit with defendant, including Mrs. Weaver's testimony that defendant said police had threatened to arrest defendant's son and a close loved one unless he cooperated. In addition, she testified that when her mother left to use the restroom, defendant told her the close loved one police had threatened to arrest was his mother. Defendant seemed very agitated, and his body was shaking. She told defendant not to talk to anyone until he conferred with a lawyer. He replied that he had "no choice" and repeated that police would arrest his son and mother. Defendant's son was 12 years old at the time.

Defendant then testified. He asserted that when the police first came to talk to him at the prison, he was taking 600 milligrams of Mellaril a day to calm himself down. The officers did not inform him of his *Miranda* rights at any time during that first interview. When defendant denied having anything to do with the crimes, the officers told him they did not have "time to mess around" and that they would go to Oroville and arrest his son and another member of his family. Not wishing to have his son arrested, defendant told them he wanted to speak with his mother. If the police would arrange it, he agreed to speak to the officers after speaking to his mother. He acknowledged the police officers did not tape-record that first interview.

His mother and sister visited him the next day. While his mother was away from the table, defendant told his sister that he believed police intended to arrest his mother. After their visit, he met with the two officers. Before the tape recorder was turned on, they read him his *Miranda* rights and he indicated he would like to have an attorney present. He also said he wanted his invocation of his right to counsel on the tape. Sergeant Johnson

told him it was not necessary to put that information on the tape because "everybody knows that you want an attorney present." Defendant then went ahead without an attorney and gave a statement because he did not want police to arrest his son or other family member.

On cross-examination, defendant confirmed he never put his invocation of his right to counsel on the tape. He believed that had he done so, police would have terminated the interview and arrested his son. He did not know of any reason why police would arrest his son. He believed the threat to arrest a close family member referred to his mother because "she is the only one that I am real close to." He did not know of any reason why police would arrest his mother.

Defendant testified that on the second day of interviews, police advised him of his rights twice, once before the tape recorder was running and once after. Before the tape was turned on, the police officers told him what to say in response to each *Miranda* advisement. After the tape was turned on, defendant testified, he repeated each response as instructed. Defendant admitted he knew he had the right to an attorney and that one would be provided him should he so desire.

Defendant admitted the third interview was "somewhat" his idea and that he did not invoke his right to counsel. Defendant did not remember whether the officer had advised him of his rights, but he "knew better than to ask [for an attorney] on tape." He stated: "I wanted to make sure that they had everything they wanted so they wouldn't arrest my son and other members of my family."

On redirect, defendant stated that his son had helped him dig the hole in which Levoy was buried and that was the reason he believed police might arrest him. He averred the "main reason" he gave a statement to police was to protect his family.

The prosecutor then recalled Sergeant Davis, who reaffirmed that defendant had never asked for an attorney and that he had never threatened defendant by saying he would arrest his son. Sergeant Johnson, also recalled, similarly denied threatening defendant with the arrest of his son.

After listening to the tapes and considering the briefing, the trial court ruled that defendant had been properly advised of and waived his *Miranda* rights; that despite his ingestion of prescribed drugs, his mental state was such that he could, and did, give his statement intelligently, freely and voluntarily; and that such statement was not the product of any coercion

stemming from a threat to arrest defendant's family members. The court stated it was convinced of the voluntariness of defendant's statement beyond a reasonable doubt.

### b. *The applicable law*

■ The law is well settled. When reviewing a trial court's decision on a motion that a statement was collected in violation of the defendant's rights under *Miranda, supra,* 384 U.S. 436, we defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032-1033 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement was obtained in violation of *Miranda*'s rules (*Bradford, supra,* at p. 1033), that is, whether (assuming the defendant was in custody) the statement was preceded by the now-famous admonition of *Miranda* rights: the defendant has the right to remain silent, any statement he might make can be used against him, he has the right to the presence of an attorney, and an attorney will be provided at state expense if he cannot afford one. (*Dickerson v. United States* (2000) 530 U.S. 428, 435 [120 S.Ct. 2326, 2331-2332, 147 L.Ed.2d 405].)

If a custodial defendant requests counsel, all questioning must cease. (*Edwards v. Arizona* (1981) 451 U.S. 477, 482 [101 S.Ct. 1880, 1883-1884, 68 L.Ed.2d 378].) Statements made by a custodial defendant in the absence of *Miranda* warnings are inadmissible in the prosecution's case-in-chief. (*People v. Bradford, supra,* 14 Cal.4th at p. 1033.) ■ There is no dispute in this case that police were interrogating defendant (see, e.g., *Rhode Island v. Innis* (1980) 446 U.S. 291 [100 S.Ct. 1682, 64 L.Ed.2d 297]) or that defendant was in custody. The only issues are whether defendant was given *Miranda* warnings before giving his statements on July 28 and August 2, 1982, whether he invoked his right to counsel, and whether he was coerced into waiving his rights by threats to arrest his son and another family member. We turn to those issues now.

### c. *Analysis*

The difference in the testimony regarding whether Sergeants Davis and Johnson read defendant his *Miranda* warnings was striking. The officers testified they read defendant the *Miranda* warnings from a preprinted card. Defendant testified they either did not read him his rights, or they suggested to him (while the tape recorder was off) that should he invoke his rights, they would arrest his son. Defendant's story was supported by the testimony

of his mother and his sister. The officers expressly denied such threats. We assume the trial court considered the demeanor of the witnesses, as well as the interest each party had to tell the truth. We also assume the trial court considered such factors as the likelihood that police would threaten to arrest a 12-year-old boy for a double murder, the likelihood they would threaten to arrest defendant's mother in the absence of any evidence she was at all involved in the crimes, the inability of defendant to explain why he believed the officers' alleged threat to arrest a close family member was a threat to arrest his mother, the fact defendant waived his *Miranda* rights on the tape recording, the tone of his voice on the tape, the evidence of his medication, and the testimony describing his behavior, mood, and emotional state during the interviews.

All things considered, we conclude substantial evidence supports the trial court's decision to credit the testimony of Sergeants Davis and Johnson that, before interrogating defendant, they properly *"Mirandized"* him and obtained a waiver of his rights. Substantial evidence also supports the trial court's decision to disbelieve defendant, his sister and his mother that police coerced defendant into waiving his rights. This was a simple credibility determination for which we defer to the trial courts.

Defendant raises a number of counterarguments, but all are speculative and do not undermine the substantial nature of the evidentiary support for the trial court's decision. He suggests the short duration of the first interview on July 27, 1982, was somehow suspicious. Not at all: police testified that, on that day, defendant denied involvement but agreed to speak with them again if he could first talk to his mother. Defendant also argues the fact the first interview was not tape-recorded is also suspicious. But Davis and Johnson explained the problem they had bringing their own recording equipment into the prison, a problem that was solved by the next day when they were able to use the prison's own recording equipment.

Nor is it suspicious that Sergeant Davis states at the beginning of the tape of the July 28 interview that "one of the things we talked about was advising you of your rights and *at this time* I'm gonna advise you of your rights." (Italics added.) By saying "at this time" Davis did not, as defendant argues, necessarily mean that he had failed to read defendant his *Miranda* rights on the previous day.

Defendant further argues that the interviews on July 28 and August 2 were "inextricably connected" with the interview on July 27 and, because police did not read him his *Miranda* warnings on July 27, the subsequent interviews were tainted by that illegality. The trial court found, however, that the

officers had read defendant his *Miranda* warnings on July 27, and substantial evidence supports that decision, namely, the testimony of Sergeants Davis and Johnson. This argument thus fails.

Defendant also contends that because he invoked his right to counsel on July 27, subsequent interrogations without counsel were prohibited even if he was re-*Mirandized*. But implicit in the trial court's ruling that defendant executed a sufficient waiver of his rights on July 27 is the conclusion that defendant did not invoke his right to counsel at that time. Subsequent interrogations, therefore, were permissible, provided defendant was re-*Mirandized*. That he was readmonished before each interview with police is supported by substantial evidence. Accordingly, the rule against interrogations following an invocation of counsel is inapplicable.

 d. *Voluntariness*

*Miranda* aside, defendant also contends admission at trial of the statements he made to police on July 28 and August 2, 1982, violated his constitutional rights because they were involuntarily made. ▉ An involuntary confession is inadmissible under the due process clauses of both the Fourteenth Amendment to the federal Constitution (*Jackson v. Denno* (1964) 378 U.S. 368, 385-386 [84 S.Ct. 1774, 1785-1786, 12 L.Ed.2d 908, 1 A.L.R.3d 1205]) as well as article I, sections 7 and 15 of the California Constitution (*People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330]). Threats to arrest family members, as defendant claims occurred here, can render a subsequent confession involuntary. (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [83 S.Ct. 917, 920-921, 9 L.Ed.2d 922]; *People v. Matlock* (1959) 51 Cal.2d 682, 697 [336 P.2d 505, 71 A.L.R.2d 605].) "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. (*Withrow* v. *Williams* (1993) 507 U.S. 680, 693-694 [113 S.Ct. 1745, 1753-1755, 123 L.Ed.2d 407].)" (*People v. Massie* (1998) 19 Cal.4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29].) Defendant raised the voluntariness issue below, and the trial court denied his motion to suppress on this ground.

Although at present the state's burden is to prove the voluntariness of a confession by a preponderance of the evidence, defendant's crimes occurred before the enactment of article I, section 28, subdivision (d) of the state Constitution, the so-called Truth in Evidence provision that was added to the state charter by passage of Proposition 8 in 1982. Accordingly, at defendant's trial the state was required to show the confession was voluntary beyond a reasonable doubt. (*People v. Benson, supra*, 52 Cal.3d at p. 770 &

fn. 1; *People v. Markham* (1989) 49 Cal.3d 63, 65 [260 Cal.Rptr. 273, 775 P.2d 1042].)[5]

On appeal, our role when reviewing the trial court's determination that a confession was voluntary is similar to the standard applied in the *Miranda* context: we independently examine the record, but, to the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence. (*People v. Howard* (1988) 44 Cal.3d 375, 394 [243 Cal.Rptr. 842, 749 P.2d 279].)

■ Defendant's argument that his statements to police on July 28 and August 2, 1982, were involuntary is brief and no more persuasive than his *Miranda*-related claims. He contends the threats to arrest his son as well as a close family member (that he took to be a threat to arrest his mother) overcame his free will, causing him to confess his crimes. In denying the motion to suppress, however, the trial court implicitly disbelieved the testimony of defendant, his mother and his sister and instead credited that of Sergeants Davis and Johnson that no such threats were made. There is substantial evidence supporting this implied finding: both officers directly and strongly denied issuing such threats, no such threats appear on the tape recording of the interrogations, and the implausibility that police would arrest a 12-year-old boy or Dorothy Weaver in the absence of any evidence of their complicity in the crimes all support the trial court's decision.

Although defendant does not expressly make the argument here, to the extent he suggests his statements were involuntary because at the time of the interviews with police he was under the influence of medication, we reject that claim as well. The due process inquiry focuses on the alleged wrongful and coercive actions of the state, here Sergeants Davis and Johnson, and not the mental state of defendant. (*Colorado v. Connelly* (1986) 479 U.S. 157, 165 [107 S.Ct. 515, 520-521, 93 L.Ed.2d 473].) Because the trial court determined that neither officer engaged in wrongful conduct, the mere fact defendant was taking medication prescribed by the prison medical staff is insufficient to establish a claim of involuntariness. (See *Clabourne v. Lewis* (9th Cir. 1995) 64 F.3d 1373, 1379 [defendant's confession not involuntary despite being under the influence of prison-prescribed Thorazine]; see also

---

[5]We reject respondent's argument that "since the appropriate standard of proof to be applied is a procedural question, the preponderance test applies to all statements taken after June 8, 1982, regardless of when the crimes occurred." We held in *People v. Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149], that "Proposition 8 applies only to prosecutions for crimes committed on or after its effective date." We have also expressed a view on the precise question of the proper burden of proof, explaining that the date of the crime, and not the date of the confession, is the controlling benchmark. (*People v. Benson, supra*, 52 Cal.3d at p. 770, fn. 1.)

*People v. Hendricks* (1987) 43 Cal.3d 584, 591 [238 Cal.Rptr. 66, 737 P.2d 1350] [consumption of alcoholic beverages during interrogation did not render confession involuntary].)

### e. *Boykin-Tahl*

Finally, defendant contends that because his statements to police on July 28 and August 2, 1982, constituted a full confession of guilt, those statements should be deemed inadmissible because police failed to obtain specific waivers as to each constitutional right he was forfeiting by confessing, analogizing to the legal requirements applicable to guilty pleas. (*Boykin v. Alabama* (1969) 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].)[6]

No state or federal authority exists for extending the protections of *Boykin* and *Tahl* to extrajudicial confessions. Nor is such extension necessary. The warning required by *Miranda* adequately informs an accused of his right against compelled self-incrimination under the Fifth and Fourteenth Amendments to the federal Constitution, and police here obtained a waiver of that right from defendant. The other rights an accused waives by pleading guilty—the right to a jury trial and to confront one's accusers (*Boykin v. Alabama, supra,* 395 U.S. at p. 243 [89 S.Ct. at p. 1712])—are not lost by providing police with an out-of-court confession. The confession thus did not necessitate a prophylactic *Boykin*-type warning.

### 2. *The Search of Defendant's Backyard*

Defendant moved to suppress the body of Barbara Levoy and other evidence flowing from the discovery of her body, such as clothing, autopsy reports and dental comparison evidence, claiming the search police conducted exceeded the scope of the consent given by defendant's ex-wife, Barbara Weaver.[7] A hearing on the suppression motion was held on September 1, 1983. Sergeant Glen Johnson testified that he and Sergeant Gary Davis traveled to defendant's Oroville home after learning from inmate Ricky Gibson that defendant had told Gibson he was guilty of a double murder and that one of the victims was buried in his yard. They contacted Barbara Weaver at her home, explained the purpose of their visit, and asked whether defendant had done any digging in the yard early in 1981. She replied in the affirmative. Davis told defendant's ex-wife that police proposed to dig in her yard to attempt to find the victim's body, and she

---

[6] Although respondent argues defendant failed to preserve this issue for appeal, defendant is correct that he raised the issue in the trial court.

[7] By the time of the search some 18 months after the crime, defendant was in prison for other crimes and his wife was in the process of divorcing him.

consented orally. She then signed the standard sheriff's office consent form, which states: "I consent that Officer _____ of the Kern County Sheriff's Department and deputies under his control enter my residence and/or my motor vehicle(s) to search for evidence pertinent to his investigation. [¶] I am giving this written permission to these officers freely and voluntarily, without any threats or promises having been made, and after having been informed by said officer that I have a right to refuse this search and/or seizure." The form is signed by Barbara Weaver; the names of Sergeants Davis and Johnson are inscribed in the blank space.

On cross-examination, Sergeant Johnson testified he had, on a few previous occasions, added handwritten modifications to the standard consent form and had the consenting person initial the changes. No particular reason existed why he failed to modify the form in this case to specify he intended to dig up the yard.

Barbara Weaver, defendant's ex-wife, also testified. She stated she signed the consent form and that some discussion took place about digging in the yard, but "[i]t was just talk." She understood her consent to include searching her residence only. On cross-examination, she admitted the officers had told her they suspected a body was buried in her yard and that they wished to search her yard, but she did not remember telling the officers they could dig up her yard. Once the officers began digging, she was afraid to ask them to stop.

The trial court denied the suppression motion, saying: "I find the testimony of [Barbara] Weaver to be incredible in certain aspects about the officers asking to search the house for a body and she thought well, maybe there could possibly be a body in the house but not in the yard when there was evidence that the defendant had done some digging in the yard and she knew about the digging and even pointed it out to the officers and cooperated with the officers in showing them places where he had done some digging. Then her answers to some of the specific questions as to what she said specifically, she would tense up each time and then take quite a bit of time to answer those questions. [¶] I do not feel that she was being truthful in answers to many of those specific questions as to what she said. [¶] . . . [¶] I believe the officer's testimony. I don't believe her testimony in certain particulars when she indicates that she does not remember telling the officer specific things and that she did not consent to the search of the yard, orally at least, and so the motion to suppress is denied."

Defendant contends the trial court erred, and that the search exceeded the scope of Barbara Weaver's consent. He also contends her consent was involuntary. We disagree.

■ "The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

■ As with the *Miranda* issue discussed above, this issue turns on a credibility determination made by the trial court. Sergeant Johnson testified Barbara Weaver gave her consent to search the yard; she testified she gave no such consent. After hearing both witnesses testify, the trial court specifically credited Sergeant Johnson, noting Barbara Weaver tensed up and then took a long time to answer certain questions. Evaluating such nonverbal factors in determining the credibility of witnesses is a task uniquely for the trial court, as such factors are not apparent from the face of the record. We thus defer to the trial court's decision in this matter and find substantial evidence supports the court's decision that Barbara Weaver consented to a search of her yard.

Defendant further contends his suppression motion should have been granted because Barbara Weaver's consent to the search was involuntary. We agree with respondent that defendant did not preserve this issue for appeal. A claim based on the voluntariness of Barbara Weaver's consent appears nowhere in defendant's moving papers, defense counsel's oral argument at the suppression hearing, or in the trial court's oral decision. The issue is thus not properly before us. (*People v. Bradford, supra*, 14 Cal.4th at p. 1038.)

Assuming the issue was preserved, we reject it on the merits. Six or seven officers presented themselves at Barbara Weaver's home (Sergeants Davis and Johnson, as well as four or five other officers who were there to dig), and defendant suggests they were an intimidating force. Although the state has the burden of proving that Barbara Weaver's "consent was . . . freely and voluntarily given," and the "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority" (*Bumper v. North Carolina* (1968) 391 U.S. 543, 548-549 [88 S.Ct. 1788, 1792, 20 L.Ed.2d 797]), the prosecution satisfied this burden with evidence of Barbara Weaver's signed consent form and her testimony that she freely consented to a search of her house. Nothing in this record suggests Barbara Weaver's free will was overborne by the searching officers. We thus reject defendant's claim that her consent to search the yard was involuntary.

### 3. Alleged Ineffective Assistance of Counsel: Failure to Present a Diminished Capacity Defense

■ At the guilt phase of the trial, defense counsel defended the charge that defendant was guilty of murdering Radford in the first degree by attempting to persuade the jury that defendant did not intend to kill Radford, but only to knock him unconscious. As to Levoy, counsel argued both that the killing did not occur during the commission of the rapes because the sexual assaults had long since terminated by the time defendant killed her, and that defendant had strangled Levoy when she bit him on the thumb, enraging him and causing him to lose contact with reality. As to Levoy, then, counsel argued the criminal homicide was not elevated to first degree murder on either a felony-murder or a premeditation theory. Despite possession of a large amount of expert evidence related to defendant's mental condition, counsel chose not to present a defense of diminished capacity.[8] Defendant claims this decision demonstrates he was not afforded the effective assistance of counsel. We disagree.

■ " '[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington*[, *supra*,] 466 U.S. 668, 687-688 . . . .) Second, he must also show prejudice flowing from counsel's performance or lack thereof. (*Strickland, supra*, at pp. 691-692 . . . .) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto*[, *supra*,] 48 Cal.3d 1247, 1257. . . ; *Strickland, supra*, at p. 694 . . . .)' (*People* v. *Jennings*[, *supra*] 53 Cal.3d 334, 357. . . .)" (*In re Avena*, supra, 12 Cal.4th at p. 721, first ellipsis in *Avena*.)

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel (see *People* v. *Wright* (1990) 52 Cal.3d 367, 412), and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 [48 Cal.Rptr.2d 525, 907 P.2d 373], quoting *Strickland v. Washington, supra*, 466 U.S. at p. 689 [104 S.Ct. at p. 2065].) "[W]e accord great deference to counsel's tactical decisions" (*People v. Frye* (1998) 18 Cal.4th 894, 979 [77 Cal.Rptr.2d 25, 959

---

[8]Because defendant's crimes occurred before the voters passed Proposition 8 in June 1982, the defense of diminished capacity was still available. (*In re Avena* (1996) 12 Cal.4th 694, 722-723 [49 Cal.Rptr.2d 413, 909 P.2d 1017]; *People v. Saille* (1991) 54 Cal.3d 1103, 1112 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

P.2d 183]), and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 [65 Cal.Rptr.2d 240, 939 P.2d 354]). "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. (*People v. Earp* (1999) 20 Cal.4th 826, 896 [85 Cal.Rptr.2d 857, 978 P.2d 15]; see also *People v. Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144] [on appeal, a conviction will be reversed on the ground of ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission"].)

 In this case, however, counsel set forth on the record specific reasons for deciding to forgo a diminished capacity defense. "[T]here are many tactical considerations that the defense has to review prior to commenting on evidence and taking a basic theory of defense when arguing the case at the conclusion of the evidence. We made a determination that we didn't want to attack diminished capacity or use diminished capacity as an argument, although we felt it was necessary as a jury instruction because of some of the evidence brought up; however, if we had argued the fact that there was diminished capacity, we would have not had proceeded [*sic*] on argument that we did, which is [defendant] looked at the possibility of personally attempting to kill someone, reflected [on] that [possibility] and ma[d]e the decision, a thinking decision of only attempting to knock the man out. We couldn't have faithfully argued that to the jury if we had the counter argument that he didn't have the ability to deliberate and premeditate so we decided to go with the strongest evidence we had, which was no intent to kill. [¶] . . . [¶] Further, we decided not to submit any evidence of diminished capacity by way of medical testimony, reserving that defense for the insanity [*sic*] phase rather than coming in and destroying whatever evidence we were presenting relative to his ability to decide and make a logical conclusion as to his actions. We felt that there would be an inconsistent argument which would water down our credibility with the jury if we were to go both ways, so we decided to go and approach it one way."

"Those were tactical decisions and I am not saying that what we did was right, looking at the results, but it was a decision that we had to make and we

believe that they were considered opinions predicated upon the evidence, [and the] state of the law as we knew it to be."

As is clear, counsel had a reasoned explanation for their decision to forgo a diminished capacity defense at trial and to rely on what they considered their stronger arguments, namely, that defendant did not premeditate the killings and that Levoy's killing came after the rape had terminated. Defendant makes a number of arguments why he believes counsel's admittedly tactical decision was deficient, but none is availing. He claims counsel were mistaken in believing that a diminished capacity defense would have been inconsistent with the defense that defendant made a "thinking decision" to knock Radford out but not to kill him. Yet defendant admits that in his pretrial statement to police, he said he intended merely to knock Radford out. At trial, moreover, defendant testified he did not think Radford would suffer serious injury.

Defendant also contends trial counsel were mistaken in concluding a diminished capacity defense would have been inconsistent with their defense that Levoy's killing did not occur during the commission of the rapes. But in making the temporal argument that the rapes had terminated, defense counsel David Huffman may well have believed that reliance as well on a diminished capacity defense would have undercut the thrust of the main defense theory of the case. We take counsel's statement that he could not have "faithfully argued" his chosen defense theory if he also used a diminished capacity argument to mean as much.

We reach the same conclusion with respect to defendant's claim that the unconsciousness defense, that is, that defendant became enraged and lost consciousness when Levoy bit his thumb, was not inconsistent with a diminished capacity defense. That may be true, but counsel's decision to reserve the mental evidence for the sanity phase so as not to blunt its impact was not unreasonable. (See *People v. Miller* (1972) 7 Cal.3d 562, 572 [102 Cal.Rptr. 841, 498 P.2d 1089] [evidence of mental incapacity would lose much of its impact at the sanity phase if presented earlier].)

Although the case was governed by the pre-*Pope* legal standard for ineffective assistance of counsel,[9] *People v. Miller, supra,* 7 Cal.3d 562, posed the exact issue we confront in this case: was counsel ineffective for deciding to forgo presentation of mental incapacity evidence at the guilt

---

[9]Compare *People v. Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487] (whether trial was reduced to a farce or sham by counsel's actions or omissions) with *People v. Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1] (stating the modern standard).

phase and to reserve it instead for the sanity phase? We found counsel's tactical decision there was not unreasonable, explaining: "We touch here on a difficult tactical problem facing every defense counsel who possesses psychiatric evidence bearing on his client's condition at the time of the crime. Since the development of the *Wells-Gorshen* line of cases,[10] this evidence is usually admissible at both the guilt phase and the sanity phase. Counsel's dilemma is, therefore, at which phase should he introduce this evidence? In *People* v. *Coogler* (1969) . . . 71 Cal.2d 153, 169 [77 Cal.Rptr. 790, 454 P.2d 686], we upheld the competency of counsel who chose to introduce such evidence at the guilt phase only: 'His decision not to enter an insanity plea may have been based upon a fear that such a plea would prejudice his client's claim of diminished capacity; if the jury knew that an insanity hearing would follow in the event of defendant's conviction, it might treat summarily the psychiatric testimony as to whether defendant could form the requisite intent to commit the crimes charged.' Even more certain than this conjecture, however, is that a trier of fact would tend to 'treat summarily' such evidence if it were introduced at the sanity phase after the same trier had already rejected it at the guilt phase. It follows that when, as here, counsel concludes his client has a valid defense of not guilty by reason of insanity, it might be unwise for him to prematurely expose that evidence to the scrutiny of the trier of fact at the guilt phase.

"It is no solution to this dilemma for us to engage in the perilous process of second-guessing whichever of the alternatives counsel chooses. . . .

"Nothing is seen more clearly than with hindsight. The most that can be fairly said on this record, however, is that counsel's decision to delay introducing his evidence of defendant's mental state until the sanity phase was a debatable trial tactic. Yet as we reminded the bench and bar not long ago, even 'debatable trial tactics' do not 'constitute a deprivation of the effective assistance of counsel.' (*People* v. *McGautha* (1969) 70 Cal.2d 770, 784 [76 Cal.Rptr. 434, 452 P.2d 650], affd. *sub nom. McGautha* v. *California* (1971) 402 U.S. 183 [28 L.Ed.2d 711, 91 S.Ct. 1454].) When, as here, 'there is no showing that counsel did not research the facts or the law, or that he was ignorant of a crucial defense' (*In re Hawley* (1967) . . . 67 Cal.2d 824, 829 [63 Cal.Rptr. 831, 433 P.2d 919]), and counsel makes a tactical choice to withhold certain evidence for a later stage of trial, sound policy reasons persuade us to defer to counsel's judgment in the matter." (*People* v. *Miller*, *supra*, 7 Cal.3d at pp. 572-574, fns. omitted.)

We agree and conclude the record does not demonstrate that counsel were constitutionally ineffective under either the state or federal Constitution

---

[10]*People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492].

because they chose to withhold the evidence of defendant's alleged diminished capacity until the sanity phase of the trial.

### 4. *Application of the Corpus Delicti Rule to Felony Murder*

Based on his statements to police, defendant originally was charged with felony-murder special-circumstance allegations based on kidnapping, rape, and sodomy. Because the decomposition of Levoy's body was too advanced to confirm that she had been sexually assaulted, the only evidence of these sexual assaults came from defendant himself. Defendant moved to strike the two sex-crime-based special-circumstance allegations, citing the corpus delicti rule, and the trial court granted the motion.

As to the charged murder of Levoy, however, the prosecution proceeded on the dual theories that defendant killed her after premeditating the crime and killed her during the commission of a rape, i.e., on a felony-murder theory. Defendant now contends the corpus delicti rule should prohibit permitting the jury to rely on a felony-murder theory to elevate the degree of a homicide to the first degree, when the only evidence of the sole qualifying felony (in this case, rape) comes from the defendant's own statements. In the alternative, he claims that using his uncorroborated admission he raped Levoy to establish the degree of the homicide violates his rights under the Eighth and Fourteenth Amendments to the federal Constitution.

"The corpus delicti rule requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions. [Citations.] 'The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause.' [Citation.] Such proof, however, may be circumstantial and need only be a slight or prima facie showing 'permitting the reasonable inference that a crime was committed.' [Citation.]" (*People v. Jennings, supra,* 53 Cal.3d at p. 364.) When the People have established the corpus delicti of murder, a defendant's extrajudicial statements may be admitted to prove an underlying felony for felony-murder purposes even if the felony cannot be proved by evidence other than such statements. (*People v. Cantrell* (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256], disapproved on another ground by *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)[11]

Defendant concedes a long line of decisions has found the corpus delicti rule inapplicable to felonies used to establish the degree of a homicide (*People v. Cooper* (1960) 53 Cal.2d 755, 765 [3 Cal.Rptr. 148, 349 P.2d

---

[11]Although not at issue here, at the time of defendant's trial, the corpus delicti rule applied to felony-based special-circumstance allegations (*People v. Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887]), a rule later abrogated by statute (§ 190.41, enacted by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990)). The new rule is not

964]; *People v. Miller* (1951) 37 Cal.2d 801, 806 [236 P.2d 137] ["The corpus delicti of the crime of murder having been established by independent evidence, . . . extrajudicial statements of the accused . . . may be used to establish the degree of the crime committed"]), but he contends the need for heightened reliability in capital cases demands that we extend the protection of the rule to cases such as his. He also argues the rule established by these decisions permitted the prosecution in his case "to circumvent the stated policy [of the corpus delicti rule] of protecting an accused from possibly fabricated testimony." (See *People v. Cullen* (1951) 37 Cal.2d 614, 625 [234 P.2d 1].)

Defendant's contentions are unpersuasive. The United States Supreme Court's well-known admonition, on which defendant relies, about the need for heightened reliability in capital cases, refers to the determination of penalty, not the degree of the homicide. (*Woodson v. North Carolina* (1976) 428 U.S. 280, 305 [96 S.Ct. 2978, 2991, 49 L.Ed.2d 944] (lead opn. of Powell, J.) ["Because of that qualitative difference [between a sentence of life and death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"].) We are unaware of any holding by the high court, and defendant cites none, requiring this court to modify its long-standing state-law-based rules governing the admissibility of evidence at the guilt phase merely because in a particular case the death penalty is a possible outcome.

The motivating idea of the corpus delicti rule—to protect an accused from his or her own fabricated statements—has little application in this situation, where the corpus delicti of murder is established by ample evidence of a homicide committed by a criminal agency. Defendant is sufficiently protected from the possibility of his own folly, his possible mental impairment, or police overreaching by the rule rendering his statements inadmissible to prove the substantive sex crimes that he admitted having committed. Application of the corpus delicti rule to the charge that he committed murder also protects him. He finally is protected by his ability, should he so desire, to attempt to exclude his statements by proving they were the product of his mental impairment or of police misconduct. (See *Colorado v. Connelly*, *supra*, 479 U.S. at p. 167 [107 S.Ct. at p. 522] ["coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"].)

Once the criminal agency has been established by prima facie evidence that a murder was committed, permitting a defendant's own statements to

retroactive. (*People v. Ray* (1996) 13 Cal.4th 313, 341, fn. 13 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

help establish the degree of the crime does not violate his rights to due process, a fair trial, or to be free from cruel and unusual punishment, or other constitutional guarantee. Although it is unclear whether defendant is relying on any asserted state constitutional basis for his claim, we reject such claim as well, finding no reason to interpret the state Constitution differently in this context.

### 5. *Alleged Ineffective Assistance of Counsel: Failure to Raise the Corpus Delicti Rule in Connection with the Charged Kidnapping*

■ Defendant next contends his defense counsel was ineffective for failing to move to exclude on corpus delicti grounds his extrajudicial statements that he kidnapped Levoy. We disagree. Counsel is not ineffective for failing to make a frivolous motion. We reiterate that the proof necessary to satisfy a corpus delicti challenge "need only be a slight or prima facie showing 'permitting the reasonable inference that a crime was committed.' " (*People v. Jennings, supra,* 53 Cal.3d at p. 364.) Here, Levoy was known to be traveling with Radford, and witness James Powell saw the two stranded by car trouble on the side of the road. Shortly thereafter, Radford was found with grievous and ultimately fatal injuries, and Levoy had disappeared. A search failed to reveal her whereabouts. Her body was discovered 18 months later buried in defendant's yard, hundreds of miles from the scene of her disappearance, in the opposite direction from which she was known to have been traveling, and still clad in the clothes she had been wearing on the night she disappeared. Because this evidence permits the reasonable inference Levoy was taken from the crime scene against her will and moved a substantial distance, the evidence establishes a prima facie showing that a kidnapping occurred. Any motion to exclude defendant's statements on the ground the corpus delicti for kidnapping had not been shown would have been denied. (See *People v. Alcala* (1984) 36 Cal.3d 604, 624-625 [205 Cal.Rptr. 775, 685 P.2d 1126] [finding corpus delicti of kidnapping on similar facts].) Counsel was thus not ineffective under either the state or federal Constitution for failing to make the motion.

### 6. *Application of the Corpus Delicti Rule to Levoy's Murder*

■ Prior to trial, defendant moved on corpus delicti grounds to dismiss the charge he murdered Levoy, contending the prosecution had not demonstrated a prima facie case that Levoy had been murdered. The trial court denied the motion. Defense counsel renewed the issue at trial, claiming defendant's extrajudicial statements should be excluded on corpus delicti grounds. When the trial court overruled the objection, defendant testified and explained that he killed Levoy, but the killing was not intentional. Defendant

now claims the trial court erred in overruling his motion to exclude his statements and that this error induced him to testify at trial.

Respondent argues that defendant did not adequately preserve the issue for appeal, having raised a slightly different claim below. We do not resolve that question, however, because even assuming the issue was preserved, we find the corpus delicti for Levoy's murder was more than adequately established by the evidence independent of defendant's statements. The fact of the injury is obvious: Levoy's lifeless body, unearthed in defendant's yard, is proof of that. The existence of a criminal agency as the cause of her death is reasonably inferable from the suspicious circumstances of her disappearance, including the fact Radford was killed at the same time she disappeared, as well as from the fact her body was buried in the same clothes she had been wearing when she disappeared, suggesting her death was not from natural causes.

The trial court held as much: "[T]he fact that Barbara Levoy disappeared abruptly after her companion had been killed by homicide, and that she stayed disappeared [sic] until she was discovered some eighteen months later, that she was discovered in a grave four feet approximately underground, [there is] just . . . a great deal of circumstantial evidence that she died by means of homicide . . . . [¶] . . . [¶] . . . It is obvious that it was not an accidental death, there was not a suicide, but in any event, I am amply convinced that the death has been proved and it has been proved to have been committed by criminal means."

We agree and conclude the trial court correctly denied defendant's motion, based on the corpus delicti rule, to exclude his statements implicating him in Levoy's murder. Accordingly, defendant could not have been improperly induced to testify as a result of the trial court's decision denying his motion. To the extent defendant claims that admission of his statements to prove he murdered Levoy violated his rights to a fair trial, due process, and a fair and reliable penalty verdict under the federal Constitution, we deny those claims as well.

### 7. Admission of Gruesome Photographs

Defendant next claims the trial court erred in overruling his objection to the admission into evidence of two photographs. Exhibit 7 is a photograph portraying a pool of blood on the ground where Radford was found. Exhibit 16 is an autopsy photograph of Radford's head with the scalp and hair removed. Defendant moved to exclude both photographs, arguing they were irrelevant, cumulative, and more prejudicial than probative.

We recently addressed the admission of gruesome photographs in *People v. Scheid* (1997) 16 Cal.4th 1 [65 Cal.Rptr.2d 348, 939 P.2d 748]. There we explained that only relevant evidence is admissible (*id.* at p. 13), and the trial court "has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence" (*id.* at p. 14). After examining the photographs, we agree with the trial court that the challenged photographs were relevant and therefore admissible. Exhibit 7 shows the scene where Radford was found, his body having been removed and represented in the picture by a chalk outline. Although defendant suggests the photograph was cumulative to exhibits 24 and 25, which were also admitted and show the blood splatter patterns in more detail, we agree with respondent that exhibit 7 better shows the blood in spatial perspective, arguably demonstrating the brutality of the attack. Exhibit 7 shows blood splattered several feet from where Radford lay, a fact not demonstrated by the other photographs. Although defendant further argues the prosecution did not use exhibit 7 for the purpose for which it was intended, instead relying on other exhibits, that fact does not render exhibit 7 irrelevant. We conclude the trial court did not abuse its broad discretion in admitting exhibit 7.

Exhibit 16 depicts Radford's skull with the scalp removed. Although this is gruesome business indeed, it was important to demonstrate an important point to the jury: the picture showed the victim's skull was fractured in multiple places like an eggshell, indicating the assailant had used tremendous force in his attack. The amount of force portrayed in the picture tends to rebut defendant's claim he struck Radford without the intent to kill him. The photograph was thus relevant, and the trial court did not abuse its broad discretion.

Defendant further contends, however, that the trial court should have excluded exhibit 16 as cumulative because Dr. Comparini, the Kern County deputy forensic pathologist, testified as to the amount of force used and was not challenged on this point. As we explained in *People v. Scheid, supra*, 16 Cal.4th 1, in response to a similar argument, photographs corroborative of a witness's testimony need not be excluded as cumulative merely because the witness's testimony was not challenged. (*Id.* at p. 14.) The state is not required to prove its case shorn of photographic evidence merely because the defendant agrees with a witness or stipulates to a fact. Similarly, the jury was entitled to see the physical details of the crime scene and the injuries defendant inflicted on his victims. (*People v. Crittenden, supra*, 9 Cal.4th at p. 133.)

Defendant also contends the admission of the photographs had a deleterious effect on the fairness of the penalty phase. The prosecutor urged the jury

at that phase to consider the photographs when setting the appropriate penalty, and defendant contends the photographs "created a significant risk of . . . undue influence [on the jury]" in violation of his rights under the Eighth and Fourteenth Amendments to the federal Constitution. Because we conclude the trial court did not abuse its discretion in admitting the photographs, we reject these constitutional claims as well.

Although admission of gruesome photographs theoretically can deprive a defendant of a fair trial (*People v. Cavanaugh* (1955) 44 Cal.2d 252, 268-269 [282 P.2d 53]), and trial courts should be alert to how photographs may play on a jury's emotions, especially in a capital case, we rely on our trial courts to exercise their discretion wisely, both to allow the state fairly to present its case as well as to ensure that an accused is provided with a fair trial by an impartial jury. After examining the photographs in question, we conclude the trial court did not abuse its broad discretion. Even were we to assume to the contrary, we are not persuaded a reasonable probability exists that the results of the guilt, sanity, or penalty phase would have been different had the evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## II. SANITY PHASE

### A. *Facts*

#### 1. *Evidence of Defendant's Family and Childhood*

Dr. Albert Raitt, Jr., staff psychiatrist and director of the Butte County Mental Health Program, testified defendant's maternal aunt, Kathryn Bernardo, was schizophrenic. Dr. Raitt also concluded from medical records that Bernardo's daughter (and defendant's cousin) Lucia Bernardo, was schizophrenic. Dr. Raitt explained that experts believe there is a genetic component to schizophrenia, hence the chance defendant would be schizophrenic was enhanced by the fact that his aunt and cousin were so afflicted.

Katie S. testified she is defendant's sister. She is 15 months younger than defendant and thus was 39 years old at the time of trial. When she was six years old, defendant cut off one of her fingers while playing with a hatchet. She later came to believe this act was intentional. About a year later, defendant tied her to a tree, saying he was going to hang her. She did not believe him until he began tying a noose. When he began to place the noose around her neck, she began screaming hysterically. Defendant left her tied to the tree for a long time before returning and releasing her. When she said she would tell their mother what he had done, he threatened to beat her up.

Other incidents occurred in the next three years. Once, when defendant's sister was in a field, he stampeded a herd of cattle into the field, later telling her he had done it on purpose. He also locked her in a tool shed and then set it on fire. He finally let her out when she screamed and pounded on the door; the fire got out of control and started a forest fire. Defendant's mother punished both of them for this incident.

When Katie S. was nine years old, defendant tied her up and inserted sticks into her vagina. When she was 12, defendant raped her and later told her she was pregnant. She did not tell anyone about the rape because his threats frightened her. Around that same time, she saw defendant and another boy torture a cat by rubbing sandpaper on its bottom and then pouring turpentine on it. She would sometimes get her friends to beat defendant up, although her parents punished her with a whipping when they found out. When defendant was in high school, he dated girls named Ladell and Sharon. He married his first wife, Patricia Budrow, when he was 18 years old, but continued to live with his parents. Katie S. admitted she was seeing a psychiatrist to help her deal with her childhood experiences with defendant.

### 2. *Lay Evidence of Mental Illness*

Defendant's cousin, Russell Mathiasch, testified that in the mid-1970's he lived in Texas. Around that time, he helped take defendant to a Veterans Administration hospital in Dallas for treatment for his mental illness, but defendant was turned away for lack of space; later that day, defendant was denied admission at another Veterans Administration hospital in Waco. Defendant then returned home to California.

Del Roy Barnett was a coworker and friend of defendant. They often hunted and fished together. When defendant went to Vietnam, he gave Barnett some fishing equipment because he did not expect to return. When defendant returned from Southeast Asia, he was more aggressive and outgoing. He seemed more prone to violence; he was irritable and anxious, and he drank more. He was depressed and had trouble keeping a steady job. Sometimes defendant did not appear to know Barnett was with him; defendant would talk to himself or to unseen people. Barnett thought defendant probably took drugs to stay awake when he drove his truck, but he was not sure.

Carl Hogan and Richard Archuleta testified they had been incarcerated with defendant in the Kern County jail, and they saw him talking to himself or to unseen people.

Cecil Sneed, another Kern County jail inmate, testified defendant asked him to testify that he had seen defendant talking to imaginary people. However, Sneed had never seen defendant engage in such behavior. Sometime after the encounter, he received a letter from defendant reading: "Anyone who hurt my case I would do my best to do them in." Sneed was impeached by evidence that after his testimony he was to be released from jail and given a bus ticket, and by evidence from two other jail inmates, Charles Shannon and Christopher Flores, who testified Sneed was laughing and saying defendant was his "meal ticket out of here" or words to that effect. Both Shannon and Flores reported seeing defendant awake late at night, pacing and talking to himself.

### 3. Expert Witnesses Called by the Defense

Dr. Robert Gardner conducted a presentence diagnostic evaluation of defendant for Humboldt County in 1977 following defendant's conviction of assault for hitting a woman on the head with a baseball bat. Dr. Gardner testified defendant was obviously depressed. Defendant said he had assaulted his wife several times and had volunteered for the Army in order to be killed. Dr. Gardner concluded defendant had suffered a "psychotic depressive reaction" and probably had an "underlying psychiatric disorder" of an unspecified type and "might be on the verge of becoming psychotic." Dr. Gardner stated in his report that defendant was at that time a "danger to others." Although he did not find defendant was suffering from schizophrenia, he did not rule it out.

Dr. Alfred Owre, Jr., was the chief psychiatrist for the Department of Corrections, California Men's Colony in San Luis Obispo in 1977 and evaluated defendant for parole suitability. While incarcerated at the Men's Colony, defendant was not taking any prescribed medications, such as antipsychotic medication. Dr. Owre noted defendant was in school while in prison and received satisfactory work reports. He concluded defendant was a "person without psychiatric symptomology except in his distorted relationships with women." Quoting from his 1977 report, Dr. Owre noted that, regarding relationships with women, defendant "derives pleasure from suffering at their hands," but "[w]hen stressed he derives an emotional relief from inflicting pain upon them. This is sexualized." His 1977 diagnosis was that defendant suffered from a "passive aggressive personality with depressive and then sadomasochistic features." A secondary diagnosis was that he bore "[a]ggressive sexuality towards adult women, manifested by attempted rape." Defendant presented no signs of schizophrenia to Dr. Owre. Dr. Owre found defendant was not depressed or suicidal, and he testified defendant did not complain of hallucinations or delusions.

On redirect, Dr. Owre opined that defendant was "definitely out of reality contact" and that, as he was observing him in the courtroom, Dr. Owre believed defendant was "suffering from a chronic [u]ndifferentiated schizophrenic condition. He is responding to internal messages. He shows a dearth of body sensing movements. He appears to me to have deteriorated markedly since we last had him [at the Men's Colony]."

A year after Dr. Owre's evaluation, in 1978, Dr. Jack Tolchin also conducted a periodic mental health evaluation of defendant at the California Men's Colony for the Community Release Board. He agreed with Dr. Owre's previous diagnosis of a "passive aggressive personality with sadomasochistic features or depressive features or both." This condition was not a mental disease or defect but was instead a personality disorder. He did not find defendant to be schizophrenic, but admitted defendant's personality disorder was "very severe." Dr. Tolchin recommended defendant continue in therapy and be monitored on parole by a psychiatrist.

Dr. George Chappell, a psychiatrist, was appointed by the court to examine defendant to determine his sanity in connection with his 1981 crimes in Ventura County against David Galbraith and Michelle D.[12] Dr. Chappell testified defendant told him he was taking 600 milligrams of Mellaril, an antipsychotic medication. Defendant told him he could not shave with a mirror because when he looked at his own face, he heard voices telling him to cut his own throat. Defendant reported to Dr. Chappell hearing two voices, one male and one female; defendant claimed he had heard the voices "over a period of years and months." Dr. Chappell had "had serious questions as to whether [defendant] heard voices" because there was no direct evidence of his having heard such voices and it was unusual that defendant had not complained to people close to him (like his wife) about the voices.

Defendant told Dr. Chappell that he had been taking amphetamines for the previous 18 months to stay awake while driving. Amphetamines would probably aggravate an already existing psychosis, but Dr. Chappell did not believe defendant suffered from schizophrenia or any other psychosis. Dr. Chappell believed defendant "was malingering or faking some of his symptoms." He found defendant was legally sane at the time of the Ventura County crimes.

Dr. Theodore Donaldson, a clinical psychologist, also examined defendant for insanity in connection with the Ventura County crimes. In addition to interviewing him, Dr. Donaldson gave defendant the Minnesota Multiphasic Personality Inventory and the Rorschach Projective Personality Test. Defendant told him the voices in his head argued over whether to rape Michelle D.,

---

[12]Evidence of these crimes, which occurred shortly after the crimes against Radford and Levoy, was admitted at the penalty phase. (See discussion, *post*, pt. III.A.)

the victim in the Ventura County case, and "the bad voice" won. Defendant knew the rape was wrong but did it anyway. Dr. Donaldson thought defendant might be fabricating the auditory hallucinations; he concluded defendant suffered from a "mixed personality disorder, depressive neurosis, and a long history of amphetamine abuse." Persons suffering from a personality disorder such as defendant's usually had a very small "built-in set of morals and values" and a "lack of impulse control." He did not think defendant was schizophrenic. Like Dr. Chappell, Dr. Donaldson concluded defendant was not suffering from a mental disease or defect and was not insane in connection with the Ventura County case.

Dr. Rolland Rose, a psychologist, conducted a diagnostic placement evaluation of defendant in 1981 at the California Institute for Men in Chino, a state prison. Dr. Rose had no personal recollection of defendant, but testified from his 1981 report. He found defendant exhibited an "intense hostility toward women" and diagnosed him as suffering from a "passive aggressive personality with schizoid features and sexual sadism," which he explained was a character disorder and not a mental disease or defect. He admitted that one bearing such symptoms could be suffering from schizophrenia in remission and that the character disorder Dr. Rose diagnosed could be superimposed on a psychotic disorder.

Dr. Jack Shonkwiler, a psychiatrist, testified he was presently working under a restricted license and was being supervised at a clinic by two other doctors. He testified he had examined defendant in connection with the team of defense experts, including Drs. Lundgren, Dietiker, and Cholet and Mr. Powers. He interviewed defendant and defendant's mother and sister, and he viewed videotapes of defendant answering questions pursuant to the Vietnam Era Stress Inventory. He also examined reports from prior mental health evaluations of defendant and his medical and military records.

Dr. Shonkwiler found defendant was "flooded with fantasies, images, visions of [a] sadistic sexual and aggressive nature and he has essentially no control." He noted that the fact defendant had close blood relatives who were schizophrenic gave him a "marked predisposition" to have schizophrenia. Dr. Shonkwiler's final diagnosis of defendant was "paranoid schizophrenia and post-traumatic stress [disorder]" (PTSD). He explained that the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM-III)[13] required evidence of the presence of at least one of six diagnostic

---

[13]DSM-III was the then accepted diagnostic tool in the mental health profession. (See now Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV).)

criteria under subdivision A for a diagnosis of schizophrenia, and defendant fit all six categories.[14] He had bizarre delusions (he thought he could communicate with his mother telepathically); he had grandiose delusions (he believed he could hold off police with explosives made from household objects like bicycle tires and detergent); he had auditory hallucinations involving two or more voices; and he had markedly illogical thinking.

---

[14]DSM-III contains the following diagnostic criteria for schizophrenic disorder:

"A. At least one of the following during a phase of the illness:

"(1) bizarre delusions (content is patently absurd and has *no* possible basis in fact), such as delusions of being controlled, thought broadcasting, thought insertion, or thought withdrawal

"(2) somatic, grandiose, religious, nihilistic, or other delusions without persecutory or jealous content

"(3) delusions with persecutory or jealous content if accompanied by hallucinations of any type

"(4) auditory hallucinations in which either a voice keeps up a running commentary on the individual's behavior or thoughts, or two or more voices converse with each other

"(5) auditory hallucinations on several occasions with content of more than one or two words, having no apparent relation to depression or elation

"(6) incoherence, marked loosening of associations, markedly illogical thinking, or marked poverty of content of speech if associated with at least one of the following: [¶] (a) blunted, flat, or inappropriate affect [¶] (b) delusions or hallucinations [¶] (c) catatonic or other grossly disorganized behavior

"B. Deterioration from a previous level of functioning in such areas as work, social relations, and self-care.

"C. Duration: Continuous signs of the illness for at least six months at some time during the person's life, with some signs of the illness at present. The six-month period must include an active phase during which there were symptoms from [criterion] A, with or without a prodromal or residual phase, as defined below.

"*Prodromal phase*: A clear deterioration in functioning before the active phase of the illness not due to a disturbance in mood or to a Substance Use Disorder and involving at least *two* of the symptoms noted below.

"*Residual phase*: Persistence, following the active phase of the illness, of at least *two* of the symptoms noted below, not due to a disturbance in mood or to a Substance Use Disorder.

"*Prodromal or Residual Symptoms*

"(1) social isolation or withdrawal

"(2) marked impairment in role functioning as wage-earner, student, or homemaker

"(3) markedly peculiar behavior (e.g., collecting garbage, talking to self in public, or hoarding food)

"(4) marked impairment in personal hygiene and grooming

"(5) blunted, flat, or inappropriate affect

"(6) digressive, vague, overelaborate, circumstantial, or metaphorical speech

"(7) odd or bizarre ideation, or magical thinking, e.g., superstitiousness, clairvoyance, telepathy, 'sixth sense,' 'others can feel my feelings,' overvalued ideas, ideas of reference

"(8) unusual perceptual experiences, e.g., recurrent illusions, sensing the presence of a force or person not actually present [¶] . . . [¶]

"D. The full depressive or manic syndrome (criteria A and B of major depressive or manic episode), if present, developed after any psychotic symptoms, or was brief in duration relative to the duration of the psychotic symptoms in [criterion] A.

"E. Onset of prodromal or active phase of the illness before age 45.

"F. Not due to any Organic Mental Disorder or Mental Retardation." (DSM-III, *supra*, pp. 188-190, italics in original.)

Defendant fell "somewhat" into subdivision B, and there was evidence of subdivision C although such evidence was not "dramatic." For this latter criterion, Dr. Shonkwiler noted defendant's social isolation, his blunt or flat affect, and his belief in telepathy. Defendant did not suffer from manic depression so subdivision D did not apply. Dr. Shonkwiler examined defendant when he was 38, so onset of symptoms occurred before age 45, fulfilling subdivision E. Defendant did not suffer from an organic mental disorder or retardation (subd. F).

Dr. Shonkwiler also opined that, in addition to schizophrenia, defendant suffered from "full-blown post-traumatic stress [disorder]." The witness explained that defendant's emotional detachment from his wife and children and his generally constricted affect were both indicative of PTSD. Defendant's memory impairment, difficulty concentrating and expressions of survivor guilt, apparent from the videotapes of defendant taking the Vietnam Era Stress Inventory test, were likewise consistent with PTSD. Dr. Shonkwiler testified that defendant's chosen profession as a long-haul trucker could be viewed as a means to avoid intimate relationships, which was consistent with the PTSD characteristic of avoiding activities that arouse recollection of the traumatic event. Dr. Shonkwiler surmised that defendant's amphetamine abuse may be related to a sleep disturbance, a common feature of PTSD. The witness admitted there was no evidence defendant displayed hypervigilance, or an exaggerated startle response, or that his symptoms intensified when exposed to events that symbolized or resembled the war experience, three additional symptoms of PTSD. He testified that defendant's abusive childhood predisposed him to have PTSD.

Dr. Shonkwiler also found defendant's amphetamine abuse was a factor in the crimes: "My understanding was that [defendant] would have a quart jar with amphetamines, ephedrine, maybe some valium, some elevil [*sic*], and would go 20 hours without sleep, driving a long range truck. He would just grab a fistful and stuff it [in his mouth]. He didn't even know what he was taking. I am saying that what he did may have been 30 percent schizophrenia, 30 percent post-traumatic stress, 30 percent child abuse and the rest amphetamines and sleep deprivation. But who knows what was happening back there in '81, like a half-hour, hour before he murdered Radford or kidnapped Levoy. Maybe he shoved some amphetamines in him, which would make amphetamines 90 percent of what he did."

Dr. Shonkwiler opined that if defendant were taking antipsychotic medication during prior mental health evaluations, his symptoms would have been masked.

Dr. Shonkwiler concluded that although defendant knew right from wrong, he was unable to conform his conduct to the law. As a result of his

abusive childhood, schizophrenia, PTSD, and amphetamine abuse, defendant had "[v]ery poor impulse control. He is functioning at the level, the earliest level of a child wanting something and reaching for it. No gratification delay, very poor impulse control." The witness concluded defendant was legally insane.

Dr. Kathe Lundgren, a clinical psychologist, interviewed defendant and administered a series of psychological tests to him at the request of defense counsel. She concluded defendant had "one of the most severe personality disorders" and that "[a] perceived threat to his source of affection or love," even "a slight frustration could set him into a violent act or a socially unacceptable act. Remember, that this is perceived stress, and besides his personality disorder is the psychosis, which twists reality, so even though you and I might not see something as being threatening or frustrating, in his twisted perception of it, it could be that it is frustrating to him." She concluded defendant suffered from chronic undifferentiated schizophrenia with a sociopathic, antisocial personality.

Dr. Lundgren opined that defendant attempted to fake being sicker than he was, but she determined this was just an aspect of his mental illness. She was not prepared to give a professional opinion whether defendant was legally insane.

Dr. K. Edward Dietiker, a psychologist, testified he was a member of the defense team of experts that examined defendant. He also administered some psychological tests to defendant. He concluded defendant suffered from paranoid schizophrenia. He opined that "under certain circumstances [it would be] very difficult for [defendant] to hold his behavior in conformity to the law. I think that may [vary] from one situation to another, but certain situations that involve him in the sexual sadistic controlling kinds of relationships, it may be virtually impossible." Dr. Dietiker did not express an opinion about whether defendant was insane at the time of the crimes.

Dr. Byron Wittlin, a psychiatrist, testified he worked at a Los Angeles area Veterans Administration hospital and treated PTSD patients and Vietnam War veterans. He examined defendant and read several reports and previous mental health evaluations of defendant. He believed that when defendant entered the military, he was already suffering from a psychotic illness and explained that the stress of combat could aggravate a preexisting psychotic condition. He concluded defendant suffered from schizophrenia, paranoid type, as well as PTSD, but he could not determine whether defendant was legally insane.

Dr. Clyde Donahoe, a psychologist, testified he also worked at a Los Angeles area Veterans Administration hospital and treated PTSD patients.

He examined defendant, administered psychological tests and reviewed his military records. In addition, Dr. Donahoe administered psychophysiological tests, measuring defendant's heart rate and respiration while he was shown a series of pictures, some of which portrayed scenes from the Vietnam War. Defendant self-reported on the "Traumatic Violence Scale" to Dr. Donahoe that he had "either participated in or witnessed these items: Killing of women or children, mutilation of dead bodies, mutilation of live people, inadvertent air strikes or ambushes on own or friendly troops, use of white phosphorous or napalm, torture of prisoners, mercy killing, watching a buddy die in a gruesome manner, leaving one of the civilians to die, taking human body parts as trophies, bagging dead bodies, deliberate killing of old women, men or children . . . and the routine killing of prisoners."

Dr. Donahoe concluded to a reasonable medical certainty that defendant suffered from delayed PTSD. He did not know whether defendant suffered from PTSD in 1981 when the crimes occurred, but admitted that he could "very well" have had the disorder then.

Dr. John Wilson, a clinical psychologist, works with veterans and is an expert on PTSD. He developed the Vietnam Era Stress Inventory (VESI), a diagnostic tool consisting of several hundred questions to help determine if a person suffers from PTSD as a result of service in the Vietnam War. He interviewed defendant and examined police reports and the numerous previous psychological evaluations of defendant. Defendant reported to him that he had served as a combat engineer, stood perimeter guard duty and encountered incoming mortar and "sapper" fire,[15] participated in unit patrols that "encountered anti-personnel weapons," engaged the enemy in a fire fight, was a tunnel rat (i.e., he entered underground tunnels constructed by the Viet Cong) and checked enemy base camps, and was a demolitions expert. Dr. Wilson opined that these experiences were consistent with the dates of service in defendant's military record.

Dr. Wilson testified defendant has "paranoid schizophrenia in addition to posttraumatic stress disorder and a mixed personality disorder. All three coexist." He opined that defendant was "absolutely not" faking the symptom of "thought broadcasting," that is, the belief that people know his thoughts. Dr. Wilson explained: "[Defendant's] affect was so intense that when individuals try to make [sic; mask?] their emotions, their affect [does not] quite correspond to the content of what you are saying and his was so spontaneous and his speech so pressured that that's very characteristic of someone who is suffering from this disorder."

---

[15]A "sapper" is a "member of a military engineer unit organized, trained, and equipped primarily to execute . . . field fortification work" or "an engineer that lays, detects, and disarms mines." (Webster's 3d New Internat. Dict. (1961) p. 2013, col. 3.)

Dr. Wilson opined that defendant's schizophrenia began developing "very early in childhood" as a result of sexual and physical abuse by his parents, especially his mother. In response to this upbringing, he began to express his sexual and aggressive feelings by engaging in antisocial behavior, as that was more comfortable than dealing with the "deeper level of his personality, where he is terribly confused and loses touch with reality, and then begins to hear voices and other things." His war experiences fed into his underlying psychosis in two ways. First, they gave sanction to his violent impulses. Second, the stress of war removed "whatever remaining controls he had over his impulses. What we now have is an individual with pre-existing psychotic tendencies, learned psychopathic antisocial personality disorder kinds of traits, but with no means to modulate them, because the effect of the war stress was to pull away those tenuous controls, ego controls, ego defenses, so that in one sense what we have is now this interplay. The post-traumatic stress disorder causes him to feel vulnerable. He re-experiences images, nightmares, feelings connected to Vietnam. Those make him feel vulnerable. That then feeds back into the psychosis, so he begins to have hallucinations and hear voices. To cope with that, he behaves in an antisocial way. So the three [psychological conditions, namely schizophrenia, PTSD, and personality disorder,] literally feed into each other."

Dr. Wilson concluded defendant was legally insane because, although he could distinguish right from wrong, he "could not conform his conduct to the requirements of the law." He had read the reports of the four experts later called by the prosecution, Drs. Cutting, Criswell, Burdick and Matychowiak, and concluded they were incorrect in concluding defendant was sane, and that all four experts overlooked defendant's PTSD.

Defendant's final sanity phase witness was Dr. Harry Kormos, a psychiatrist. He is an expert on PTSD and the psychological problems of veterans, and had worked with hundreds of veterans. He reviewed 10 to 12 inches of documents relevant to defendant, including defendant's past mental health evaluations, the police reports of the crimes, defendant's military record, and videotapes of defendant answering the VESI questions. He also interviewed defendant for two hours. He found defendant's responses on the VESI videotapes to be sincere and consistent with those of other PTSD sufferers. He concluded defendant suffered from paranoid schizophrenia and chronic PTSD.

Dr. Kormos explained that only a minority of psychologists and psychiatrists at the time (1985) were "well versed" in PTSD and that it was a common error among psychiatrists to focus on a patient's childhood and ignore the psychological problems stemming from combat service in Vietnam. In addition, if defendant was taking an antipsychotic drug like Mellaril,

the drug could have masked the symptoms of schizophrenia by reducing the intensity of symptoms.

Dr. Kormos concluded: "I consider [defendant] to have been, at the time that [the crimes] took place, to have been aware of the requirements of the law but unable to conform to those requirements."

### 4. *Expert Witnesses Called by the People*

Dr. Paul Cutting, a psychiatrist, examined defendant at the pretrial stage to determine whether defendant was competent to stand trial; at that time Dr. Cutting also examined defendant for sanity. He interviewed defendant for a little over one hour and examined about 200 pages of documents supplied to him by the district attorney's office. He did not administer any psychological tests. Defendant told him about the voices he heard in his head, and Dr. Cutting thought defendant did actually experience such voices.

Dr. Cutting concluded defendant suffered from a schizoid personality disorder but not schizophrenia, because he did not satisfy enough of the criteria of schizophrenia listed in the DSM-III. When asked, "What criteria in DSM-III ruled out schizophrenia?" he replied: "It is a degeneration from our previous level, previous level of behavior, and he didn't have any particular regression from [a] previous high level of behavior or adaptation, his lifelong poor adaptation, and there wasn't any skid downhill in this case, he just never rose [above] a very low level of adaptation." Dr. Cutting also found defendant did not suffer from PTSD.

Dr. Cutting concluded defendant was not insane: "I felt he knew what he was doing. I felt that he could listen to one voice or the other, obey whichever voice he wanted to obey. [¶] He didn't always obey the man's voice, incidentally, because the man's voice would frequently tell him to kill himself, and, obviously, he didn't act on that man['s voice]."

Dr. Francis Matychowiak, a psychiatrist, was appointed by the superior court to examine defendant to determine if he was insane at the time of the crimes. Dr. Matychowiak examined prior medical reports, law enforcement investigative reports, and a transcript of defendant's court testimony. He also examined defendant in jail. He concluded defendant suffered from a "personality disorder, showing a mixture of paranoid and antisocial traits." He concluded defendant was sane. He rejected a diagnosis of PTSD, finding defendant's talking to imaginary persons was a "survival technique" but that it was not a posttraumatic reaction to his war experiences.

Dr. Richard Burdick, a psychiatrist, was also appointed by the court to examine defendant for sanity. Dr. Burdick concluded defendant demonstrated an antisocial personality disorder, meaning he was "responsive to

inner urges and needs without particular conscience for what effect their behavior will have on another person. . . . They tend to get into difficulties with people and are either on the fringe or breaking the law, getting arrested. They do not seem to be responsive to correction by being incarcerated or having other forms of limits put on them." He thought defendant's report of hearing voices could be fabricated but, in any event, the voices did not play a role in the crimes. He admitted that if someone suffered from both schizophrenia and a personality disorder, it was sometimes difficult to perceive the underlying schizophrenia.

Dr. Burdick admitted he was not an expert in PTSD but found no indication of that condition. He testified that although he frequently examined criminal defendants at the superior court's request, he did not frequently find them insane. He concluded defendant was not legally insane.

Dr. Francis Criswell, a psychiatrist, was, like Dr. Cutting, appointed during the pretrial period to examine defendant both for competence and sanity. Dr. Criswell testified that defendant had suffered an abusive childhood from an "extremely pathological family," but he agreed with other prosecution witnesses that, although defendant suffered from a personality disorder, he was not psychotic, schizophrenic, or otherwise suffering from a mental disease or defect. Because defendant appreciated the criminality of his conduct and could conform his actions to the law, Dr. Criswell concluded defendant was not legally insane.

Dr. Mary Cholet testified for the People. She worked on the defense team of Dr. Lundgren, Dr. Dietiker and Mr. Powers, was a psychological assistant at the time of her examination of defendant, but was a psychologist at the time of trial. She administered psychological tests to defendant and interviewed him. She disagreed with the other members of her team, concluding defendant was not schizophrenic but merely suffered from a personality disorder. She found no evidence of organic brain damage and saw no evidence of hallucinations when she was with defendant. She also concluded defendant did not suffer from PTSD, although she admitted she was not familiar with the various diagnostic tools used by experts in the area of PTSD. She concluded defendant knew the difference between right and wrong, admitted she was only "fairly familiar" with the legal definition for insanity, and admitted this case was the first one in which she had tested someone to determine their sanity.

B. *Discussion*

1. *Evidence of the Prosecution's Failure to Subpoena Defendant's Mother*

During the sanity phase, the prosecutor and defense counsel argued outside the jury's presence about whether the prosecutor could present testimony from his investigator, Carol Bender, that she had made several attempts to serve a subpoena on defendant's mother, Dorothy Weaver, and that Mrs. Weaver seemed to be avoiding service. The prosecutor argued that such evidence was relevant because it would rebut an anticipated defense argument that the state should have called Mrs. Weaver as a logical witness to rebut defendant's evidence that an abusive childhood contributed to his present (alleged) insanity. The trial court ruled Bender could so testify. When she did, however, she revealed that although she had some initial difficulty serving Mrs. Weaver, a private subpoena service hired by the district attorney's office was ultimately successful in serving Mrs. Weaver, having located her in Chico. The prosecution immediately ceased this line of questioning.

Defendant contends the trial court erred in admitting evidence of the difficulty in serving Mrs. Weaver. Although he expounds at length on this issue, speculating the jury may have inferred Mrs. Weaver was evading service at his request or because what she had to say would not corroborate his testimony, we need not resolve whether admitting Bender's testimony was error, for if it was error it was manifestly harmless. Bender's testimony was brief, factual, and gave no hint that Mrs. Weaver's expected testimony would be damaging to defendant. We thus reject the claim in its entirety.

2. *Denial of a Separate Jury*

Following completion of the guilt phase, defendant renewed his claim for a separate jury to decide his claim of insanity. Counsel argued that the defense argument at the sanity phase would be that defendant, due to mental impairments, was unable to conform his conduct to the law, a defense at odds with their guilt phase argument that defendant made a conscious decision to knock out Radford but not to kill him, and that he killed Levoy when he fell into a blind rage when she bit his thumb. The trial court denied the motion for a separate jury, noting that mental health experts testifying at the sanity phase would be subject to cross-examination based on defendant's testimony at the earlier guilt phase, and the jury's knowledge of that prior testimony would be important.

Defendant now claims the trial court abused its discretion when it denied his motion for a separate sanity phase jury. He argues that because the guilt

phase jury had just found him guilty, use of that same jury at the sanity phase forced him to be tried by a jury predisposed to find him sane. As evidence of that claim, he points to the fact the jury deliberated just 42 minutes before finding him sane, and that three jurors were laughing and talking during the reading of the sanity phase jury instructions.

Section 190.4, subdivision (c), added to the Penal Code by initiative in 1978 and unchanged since that time, provides the applicable law. It states in pertinent part: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, *the same jury shall consider any plea of not guilty by reason of insanity* pursuant to Section 1026, . . . unless for good cause shown the court discharges that jury in which case a new jury shall be drawn." (*Ibid.*, italics added.) The appropriate standard of review when considering a trial court's denial of a separate jury under section 190.4 is the abuse of discretion standard. (*People v. Rowland* (1992) 4 Cal.4th 238, 268 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

In this case, the trial court concluded the anticipated testimony from mental health experts would be difficult to understand unless the jury was aware of defendant's previous testimony at the guilt phase. That decision was well within the court's discretion and consistent with the Legislature's expressed preference for a single jury in capital cases. To sustain his claim that the trial court abused its discretion, defendant must at the very least show good cause existed for a separate sanity phase jury. He fails to do so. Although he argues his defenses at the guilt and sanity phases were conflicting, "more than speculation or the desire of counsel is necessary [to demonstrate good cause]. [Citations.] A new jury is not required, for example, simply because there is a deviation between defense strategy at the guilt trial and at the penalty trial." (*People v. Lucas, supra,* 12 Cal.4th at p. 483 [defendant sought separate penalty phase jury].)

Contrary to defendant's claim, the speed with which the jury reached a sanity phase verdict does not necessarily show the jury was biased. (See also the discussion in pt. II.B.13., *post.*) It is sheer speculation whether the rapidity of the jury's decision was the result of bias, inattention, weakness of defendant's case or strength of the state's case. We also find the alleged laughter and inattention of some jurors an insufficient basis on which to conclude the trial court abused its discretion in denying a separate sanity jury. Evidently, no contemporaneous objection was made to the behavior (defense counsel brought it up later in a motion for new trial), and we assume the trial court was aware of what happened in open court and would have admonished the jury if some jurors' actions were inappropriate.

We conclude the trial court did not abuse its discretion in denying the motion for a separate jury, there was no constitutional error, and the sanity

and penalty phase verdicts need not be reversed due to the use of the same jury throughout the trial.

### 3. *Lead Counsel's Failure to Appear in Court Due to Illness*

█ Defendant was represented at trial by lead counsel David Huffman. Pursuant to section 987, subdivision (d), the trial court also appointed cocounsel Donnalee Huffman, lead counsel's wife, to represent defendant. Both attorneys vigorously participated in the guilt phase of the trial. Defendant contends he was denied his constitutional right to counsel when he was forced to proceed in the sanity phase represented by Mrs. Huffman as his sole counsel. As explained below, we find he waived any objection at trial.

### a. *The facts*

On January 15, 1985, the second day of the sanity phase, Mr. Huffman was absent due to illness. Defendant agreed to proceed with cocounsel, Mrs. Huffman. Mr. Huffman appeared the next day, but was absent again on Thursday, January 17, 1985. The following discussion took place:

"THE COURT: . . . I understand that defense wishes to proceed and defendant will agree to proceed at this time, since the witnesses are here, with Mrs. Huffman representing Mr. Weaver. Is that correct?

"MRS. HUFFMAN: That's correct, your Honor.

"THE COURT: And you have discussed that with Mr. Weaver?

"MRS. HUFFMAN: Yes. That's all right with Mr. Weaver. [¶] Is that all right with you, Mr. Weaver?

"THE DEFENDANT: Yes."

The next court session was on Tuesday, January 22, 1985. Mr. Huffman was again absent. The trial court stated: "The record should show that yesterday I had a conference with Mrs. Huffman, during which I called [the prosecutor] by telephone, and the status of the case is now that Mr. Huffman is hospitalized . . . in Los Angeles, and will be for several days, and after discussing the pros and cons with counsel, we arrived at the determination that we should defer resuming the case until Monday[,] February the 4th, at which time I realize, at least the way things look now, Mr. Huffman will have been out of the hospital for a few days and will be in a position to be back, conducting or assisting the defense in the case. [¶] Is that correct, Mrs. Huffman?"

Mrs. Huffman responded: "Yes, that's correct, your Honor. He is getting better, and when we get back, we are not sure exactly whether he will be taking over the case completely or whether he will be assisting me as he did before . . . ." Defendant agreed to the two-week continuance.

When the parties returned to court on Friday, February 1, 1985, it became clear that Mr. Huffman's absence would be more extended than was first thought. When the court asked whether lead counsel would be present the following Monday as anticipated, the following discussion, critical to defendant's present claim, took place:

"MRS. HUFFMAN: The likelihood of him being present is almost nil, your Honor. I talked to Mr. Weaver about this. I am not sure whether he [Mr. Huffman] will be here or he will not, but Mr. Weaver told me that he was ready to proceed even if he is not here.

"THE COURT: Mr. Weaver, is that correct?

"THE DEFENDANT: Yes.

"THE COURT: You thoroughly have discussed that with Mrs. Huffman?

"THE DEFENDANT: Yes.

"THE COURT: Let me tell you what the options at this point are. If Mr. Huffman is unable to take part in the trial meaningfully, I would consider delaying the trial for a length of time to appoint counsel to assist Mrs. Huffman, that is, for that counsel to become thoroughly familiar with the case, read the transcripts that we already have prepared of the testimony to date and discuss the case with her, or I would allow the case to proceed Monday, and I understand the witnesses have been subpoenaed and so forth. Are you aware of those options?

"THE DEFENDANT: Yes, sir.

"THE COURT: With that in mind, do you wish to go ahead . . . at this time?

"THE DEFENDANT: Yes, sir."

The prosecutor then asked defendant some questions:

"MR. SHUMAKER: Mr. Weaver, do you feel that you have had an adequate time to discuss this with Mrs. Huffman?

"THE DEFENDANT: Yes.

"MR. SHUMAKER: And to make a decision about what you want to do?

"THE DEFENDANT: Yes.

"MR. SHUMAKER: Do you feel it would be beneficial if you were able to talk to another attorney about whether you should proceed on the basis that's being suggested or have someone else come into the case?

"THE DEFENDANT: I didn't understand that.

"MR. SHUMAKER: The Court, if you requested, the Court could possibly appoint another attorney to discuss the matter with you or give you additional time.

"THE DEFENDANT: I don't want no other attorney.

"MR. SHUMAKER: You do feel you have had an adequate opportunity to discuss this in the last couple of days then with Mrs. Huffman?

"THE DEFENDANT: Yes."

Mr. Huffman appeared at the sanity phase for the week of February 4-8, 1985, and then did not appear again until he argued a motion for a new trial on April 4, 1985. For the balance of the sanity phase and for the complete penalty phase, defendant was represented solely by Mrs. Huffman.

 b. *Discussion*

A criminal defendant, of course, enjoys the right to counsel under both the state and federal Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Gideon v. Wainwright* (1963) 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733]; *People v. Memro* (1995) 11 Cal.4th 786, 876 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Waiver of the right to counsel must be knowing and voluntary. (*People v. Frye, supra,* 18 Cal.4th at p. 987.) The right to appointment of a second attorney in a capital case is not a constitutional right (*Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]), but is permitted by statute in the discretion of the trial court (§ 987, subd. (d)).

Although defendant frames his argument in terms of his failure to waive the assistance of counsel, that characterization is inaccurate. There is no question defendant *was* represented by counsel, as Mrs. Huffman represented defendant at all times. Accordingly, the authorities defendant cites

addressing the outright denial of counsel, the voluntariness of a waiver of counsel, or the denial of counsel of choice are inapt. Indeed, it is unclear whether a capital defendant has any right at all to expect that one of two appointed counsel will take the reins of a capital trial at any particular time. (See *People v. Hart* (1999) 20 Cal.4th 546, 632-634 [85 Cal.Rptr.2d 132, 976 P.2d 683] [no error in cocounsel splitting representation duties with one handling the guilt phase and one the penalty phase].)

In any event, we find defendant adequately waived the presence of Mr. Huffman for the duration of his illness. As the discussion on February 1, 1985, demonstrated, it was not clear at that time when Mr. Huffman would recover from his illness, and defendant was faced with the choice of proceeding with Mrs. Huffman alone, or accepting a long continuance to permit an additional attorney to be located, appointed, and educated about the case. Defendant was expressly given this choice on the record and explicitly affirmed he had conferred with Mrs. Huffman about his rights. When questioned by the prosecutor, defendant was informed of his right to consult an independent attorney and declined the invitation. On this record, we conclude defendant adequately waived the presence of lead counsel until Mr. Huffman was well enough to return to court.

Defendant contends his waiver was not a knowing one because he was not told expressly that his waiver was for the remainder of the trial. Read in context, however, the record makes clear that no one knew how long Mr. Huffman would be gone, and that defendant was agreeing to representation by Mrs. Huffman alone until Mr. Huffman could return. Although defendant argues waivers should have been taken before every day's court session in which Mr. Huffman did not appear, this is belied by the trial court's suggestion on February 1, 1985, that one option was to appoint wholly new counsel to replace Mr. Huffman and to work with Mrs. Huffman. Such an option would not have been considered unless the trial court and the parties believed Mr. Huffman might be absent for an extended period. It was thus clearly implied that defendant's waiver of Mr. Huffman's presence was to cover an extended and indefinite period of time.

We are not persuaded a different result should obtain merely because lead counsel, arguing for a continuance on January 2, 1985, stated that "I have worked over a year-and-a-half on the psychiatric aspect of this case and I can't expect . . . [Mrs. Huffman] to come in next Monday and take over this entire psychiatric defense." Although the sanity phase was indeed complex, with allegations of PTSD as a result of defendant's service in the Vietnam War, schizophrenia, and substance abuse, and defendant's claim of being a victim of child abuse, Mrs. Huffman had two weeks from that point to

prepare and she never sought a continuance to allow further preparation although the trial court seemed amenable to granting one. Moreover, as noted above, Mr. Huffman did appear at the sanity phase for a week before suffering a relapse.

We similarly reject the further claim that, in light of defendant's apparent mental deficiencies, the trial court was required to undertake a searching and detailed inquiry into whether Mrs. Huffman was able to shoulder the load of representing defendant alone. Mrs. Huffman had actively participated in the trial to that point, and there was no suggestion she was unable to proceed. Indeed, on January 22, 1985, Mrs. Huffman stated she was not sure whether, should Mr. Huffman return, "he will be taking over the case *or whether he will be assisting me as he did before.*" (Italics added.) To reiterate, she did not seek a continuance to permit greater preparation, and the trial court was entitled to assume she was prepared to proceed.

We also agree with respondent that *People v. Gzikowski* (1982) 32 Cal.3d 580 [186 Cal.Rptr. 339, 651 P.2d 1145], cited by defendant in support, is inapposite. In that case, the defendant was represented by an inexperienced attorney who associated an experienced attorney as cocounsel to assist her at trial. Shortly before trial, experienced cocounsel withdrew. Lead counsel sought a continuance to procure new cocounsel, but the trial court denied the motion. We found the trial court's denial of a continuance resulted in the defendant's being denied his counsel of choice. By contrast, in this case defendant unequivocally stated he was willing to proceed with Mrs. Huffman alone and did not want a continuance to allow the procurement of a replacement cocounsel. Moreover, nothing in the record suggests Mrs. Huffman was an inexperienced attorney or was otherwise unable to assume lead counsel status. *Gzikowski* is thus distinguishable.

Finally, although it is unclear whether defendant is raising the same claim with regard to Mr. Huffman's absence from the penalty phase, which occupied just a few days, we reach the same conclusion for the same reasons. In sum, we find no constitutional violation flowing from defendant's decision to proceed with the sanity and penalty phases of the trial represented by Mrs. Huffman only.

### 4. *Trial Court's Failure to Initiate Competency Proceedings*

During presentation of the defense case at the sanity phase, Dr. Alfred Owre, Jr., a psychiatrist, testified that he had examined defendant briefly in 1977 in prison to determine defendant's parole suitability and had observed no evidence of schizophrenia at that time. Dr. Owre then testified

that seeing defendant across the courtroom, it appeared defendant was out of touch with reality, that he was suffering from chronic undifferentiated schizophrenia, and that he appeared to be hallucinating. Defendant claims the trial court, after hearing this testimony, should have halted the sanity hearing and initiated competency proceedings. The court's failure to do so, defendant argues, violated several of his rights guaranteed by the federal Constitution. In addition, defendant contends his defense counsel's opposition to a competency hearing constituted ineffective assistance under the state and federal Constitutions. We disagree.

■ The law in this area is settled. As noted, *ante,* trial of an incompetent criminal defendant violates his or her right to due process. (*Medina v. California, supra,* 505 U.S. at p. 448 [112 S.Ct. at pp. 2578-2579]; *People v. Hale, supra,* 44 Cal.3d at p. 539.) Section 1367, subdivision (a) states that a "defendant is mentally incompetent . . . if, as a result of mental disorder or developmental disability, [he] is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." " 'When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial.' " (*People v. Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729].) "The trial judge's ruling regarding whether a competency hearing is required should be given great deference. 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' " (*Id.* at p. 727, quoting *People v. Merkouris* (1959) 52 Cal.2d 672, 679 [344 P.2d 1].)

■ The evidence in this case of defendant's alleged incompetence falls far short of being substantial. Dr. Owre admitted his statements indicating his present belief defendant was incompetent came from his observations of defendant's in-court demeanor and not from any actual examination or testing of defendant. Dr. Owre also admitted he had not seen defendant in the hallway before the court session, smoking and conversing with his defense counsel, or seen defendant previously testifying for more than a day, coherently and responsively answering questions. The trial court concluded it had no doubt as to defendant's competency, stating: "I just quite frankly don't believe that a doctor can from the witness stand, when he is not examining a patient or not even observing a person except secondarily to his testimony, can render an opinion like that on the witnesses stand. . . ." Defense counsel seemed to agree, noting for the court that defendant had been examined by two psychiatrists and found competent.

On this record, we find the trial court's conclusion that Dr. Owre's testimony was not substantial evidence establishing a doubt of defendant's competence is entitled to deference on appeal. (See *People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1111 [it was significant the expert witness had not actually examined the defendant].) Moreover, defendant fails to mention an important fact critically undermining his claim: the trial court had already declared a doubt as to defendant's competence at the time of the arraignment, had suspended proceedings, and had defendant examined by two psychiatrists. The parties submitted the matter, and the trial court found defendant legally competent. "Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence. [Citations.]" (*People v. Medina* (1995) 11 Cal.4th 694, 734 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Dr. Owre's brief observation regarding defendant's competence does not address whether there had been a substantial change in circumstances. Accordingly, we agree with the trial court that Dr. Owre's testimony did not raise a reasonable doubt as to defendant's competence, and his testimony thus did not comprise substantial evidence of incompetence necessitating a hearing.

5. *Alleged Ineffective Assistance of Counsel: Introducing Damaging Evidence Against Defendant*

 Defendant contends defense counsel was ineffective during the sanity phase of trial for calling certain witnesses to the stand and then eliciting damaging testimony from them, and for cross-examining prosecution witnesses and similarly eliciting damaging evidence. Defendant identifies four situations in which his counsel at the sanity phase, Donnalee Huffman, was assertedly ineffective. First, he argues the first six expert witnesses Mrs. Huffman called to the witness stand (Drs. Gardner, Owre, Tolchin, Chappell, Donaldson and Rose) all testified he was not suffering from a mental disease or defect, and two of the doctors had previously found defendant was sane.

Second, he argues counsel should have redacted portions of one of the videotapes of defendant answering the VESI before playing it for the jury. Counsel videotaped defendant taking the VESI, as noted, *ante*, a diagnostic tool developed to help determine if a person suffers from PTSD as a result of service in the Vietnam War. Defendant was required to answer several hundred questions while his answers were videotaped. Defendant alleges counsel strayed from the list of approved questions and asked questions in which defendant incriminated himself in the crimes, revealed damaging

information about himself (such as his other sex crimes), or portrayed himself in a negative light (such as his belief women existed for his sexual pleasure).

Third, defendant contends that defense counsel, in her cross-examination of Dr. Francis Criswell, elicited the witness's view that defendant would pose a danger in the future. Fourth, during cross-examination of Dr. Mary Cholet, defense counsel elicited the information that defendant had committed more than the two murders at issue in the case, that defendant did not suffer from PTSD, and that he was sexually attracted to Dr. Cholet and suggested she might be one of his victims if he were not in prison.

As explained, *ante,* defendant bears the burden of demonstrating counsel's acts or omissions "fell below an objective standard of reasonableness. . . . [¶] . . . under prevailing professional norms" (*Strickland v. Washington, supra,* 466 U.S. at p. 688 [104 S.Ct. at pp. 2064-2065]), and that there is a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Jennings, supra,* 53 Cal.3d at p. 357.)

An appellate court's ability to determine from the record whether an attorney has provided constitutionally deficient legal representation is in the usual case severely hampered by the absence of an explanation of an attorney's strategy. Thus, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)" (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

This latter rule is particularly applicable here. The sanity phase was long and complicated. Evidence both for and against defendant was adduced. Respondent suggests many possible reasons why defense counsel acted as she did. We need not resolve those issues, however, for it is sufficient for our purposes to conclude that defendant has not carried his burden "to show that counsel's conduct falls outside the wide range of competent representation." (*People v. Ray, supra,* 13 Cal.4th at p. 349.) In none of the identified instances of alleged ineffectiveness was counsel asked to state on the record the reasons for her actions. Moreover, none of the identified instances are situations in which "there simply could be no satisfactory explanation" for counsel's actions or omissions. (*People v. Kraft,*

*supra,* 23 Cal.4th at p. 1069.) Accordingly, we must reject this claim, for it is one "more appropriately decided in a habeas corpus proceeding" (*People v. Mendoza Tello, supra,* 15 Cal.4th 264, 267), where the factual record can be more fully developed.

### 6. Alleged Ineffective Assistance of Counsel: Failure to Challenge Admissibility of Dr. Cholet's Testimony

Defendant next contends defense counsel was ineffective for failing to move to exclude Dr. Mary Cholet's testimony on the ground her testimony violated section 987.9,[16] and was otherwise privileged under the attorney-client and attorney work product privileges. (See *People v. Coddington* (2000) 23 Cal.4th 529, 605 [97 Cal.Rptr.2d 528, 2 P.3d 1081].) Dr. Cholet was one of a team of four experts hired by the defense to examine defendant and evaluate his mental condition. The others on the team were Dr. Kathe Lundgren, Dr. K. Edward Dietiker and Mr. Will Powers. At the time, Dr. Cholet was a registered psychological assistant and had not completed her course work or field work for her Ph.D. She was neither a psychiatrist nor a licensed psychologist when she examined defendant. She interviewed defendant, administered some psychological tests, and prepared a report.

The prosecutor, Mr. Shumaker, desired to call Dr. Cholet to the stand. Defense counsel did not object, but both parties and the trial court were concerned whether Dr. Cholet's testimony could be introduced consistent with the psychotherapist-patient privilege. Mrs. Huffman opined that the defense "would have called her [Dr. Cholet] except that she indicated to us she did not want to testify in any way in this case." Mr. Shumaker took the position that Dr. Cholet, not being a psychiatrist or licensed psychologist, fell outside the statutory privilege.[17]

After hearing Dr. Cholet testify about her credentials and her relationship with Drs. Lundgren and Dietiker (without revealing any confidential information), the trial court concluded the psychotherapist-patient privilege did not apply to her because she was neither a psychiatrist nor a licensed

[16]Section 987.9 allows a defense attorney in a capital case to request funds for the preparation of a defense, and to keep the fact of the request and the contents of the request confidential. It is unclear how counsel could invoke section 987.9 to prohibit Dr. Cholet from testifying.

[17]The parties referred to Evidence Code former section 1028, which has now been repealed. (Stats. 1985, ch. 1077, §§ 1, 2, p. 3615.) Former section 1028 (Stats. 1970, ch. 1396, § 4, p. 2625) provided there was no psychotherapist-patient privilege."[u]nless the psychotherapist is a person described in subdivision (a) or (b) of Section 1010." At the time of trial, psychological assistants were not covered by the privilege, although they are now. (See Evid. Code, § 1010, subd (f).)

psychologist. In addition, the trial court ruled that because Dr. Cholet was part of a team with Drs. Lundgren and Dietiker, and defendant waived the privilege by having those doctors testify, any privilege over information held by Dr. Cholet was also waived. Dr. Cholet later testified and opined that defendant was not psychotic but merely suffered from a personality disorder, he did not demonstrate any signs of PTSD, and he knew what he was doing at the time of the murders.

Defense counsel did not object to Dr. Cholet's testimony on the grounds defendant now claims she should have objected: section 987.9, attorney-client privilege, and attorney work product privilege. It appears from the record, however, that counsel actually desired Dr. Cholet to testify. As discussed, *ante*, because counsel did not explain on the record why she chose to acquiesce in the decision to allow Dr. Cholet to testify, and the decision is not one in which "there simply could be no satisfactory explanation" for counsel's actions (*People v. Kraft, supra*, 23 Cal.4th at p. 1069), the issue is more properly raised in a petition for a writ of habeas corpus. Limited as we are to the appellate record, we reject the contention that Mrs. Huffman was ineffective for failing to object to Dr. Cholet's testimony on grounds of attorney-client privilege, attorney work product privilege, and section 987.9.

7. *Appointing the Same Experts for Both the Competency and Sanity Hearings*

Defendant contends the appointment of the same two psychiatrists to examine him to determine his competency to stand trial and, at the same time, to determine his sanity violated his federal constitutional right to a fair trial, to be free of compelled self-incrimination, and to a reliable penalty verdict. He also contends defense counsel's failure to object to (or otherwise attempt to exclude) testimony from these psychiatrists was constitutionally ineffective representation under both the state and federal Constitutions. Finally, he contends the trial court lacked jurisdiction to appoint the two psychiatrists to examine him for sanity, both because a doubt had been declared as to his competence and because defendant had not, as yet, entered a plea of not guilty by reason of insanity.

a. *The facts*

On September 29, 1982, before defendant's arraignment, the following discussion occurred:

"MR. HUFFMAN: I would move at this time for a [Penal Code section] 1368 motion, allowing [defendant] to be examined by psychiatrists, and I would also—

"THE COURT: And by personal appearance, by looking at him, I think we should suspend proceedings.

"MR. HUFFMAN: If psychiatrists are appointed, your Honor, I am also going to make the motion of not guilty by—or enter a plea of not guilty by reason of insanity. *Possibly they could examine him for that reason, also.*

"THE COURT: For 1368, and what's the other section?

"MR. BRADSHAW [the prosecutor]: 1026, your Honor. That's sanity at the time of the act, and normally that is—saves the taxpayers' money, to have both examinations on the 1368 and—

"THE COURT: Yes. *We'll have a request for both examinations.* . . .

"THE CLERK: Two doctors or just one?

"MR. HUFFMAN: Two. And in a serious case, I think probably two is preferable.

"THE CLERK: Okay. Drs. Cutting and Criswell.

"THE COURT: Okay. Criminal proceedings are suspended pending the—*there is a present doubt in the Court's mind, based upon what Attorney Huffman has stated to me,* and also by [defendant's] appearance, personal appearance." (Italics added.)

The court then appointed two psychiatrists, Dr. Paul Cutting and Dr. Francis Criswell, to examine defendant and form an opinion on two topics: (1) Was defendant presently incompetent to stand trial? and (2) was he legally insane at the time of the crimes? After considering the reports from the two psychiatrists, the trial court found defendant was competent to stand trial and reconvened the proceedings. Thereafter, defendant initially pleaded not guilty to all charges, but later changed his plea to not guilty by reason of insanity.

The People called both Dr. Cutting and Dr. Criswell as witnesses for the prosecution at the sanity phase. After Dr. Cutting testified but before Dr. Criswell took the stand, defense counsel raised the issue of the simultaneous competence/sanity determination, asking the trial court why the two psychiatrists had evaluated defendant for sanity when the only issue at that time was defendant's competence to stand trial.

"MR. SHUMAKER [the prosecutor]: . . . . I have heard no court policy as such, but just an informal discussion as a matter of economics. I think the

clerk simply checked the different blocks on it when they were referred initially like that to evaluate for both so that somebody didn't have to be sent back.

"THE COURT: I do know I have had reports come back in other cases where the request has been for one kind of evaluation and the report comes back with two or three.

"MRS. HUFFMAN: Because there is a question of confidentiality. If there is a 1026[18] they have been appointed to do, that has to be at the request of defense counsel on an insanity plea. [Section] 1368 simply does not encompass a 1026, and my understanding at the time that [Dr.] Criswell and Dr. Cutting were appointed by the court it was on motion of the court for a 1368 evaluation only, and I think there is a possibility of confidentiality if they went into a 1026 simply because the clerks decided it is a matter of economics, and I am very concerned about that."

Despite her concern, defense counsel did not object. The trial court directed the parties to renew the discussion later, as an expert witness (Dr. Matychowiak) had been waiting to testify.

The attorneys discussed the matter further a few days later, just before Dr. Criswell took the stand. Mrs. Huffman again expressed some dismay, but did not object or otherwise move to exclude Dr. Criswell's testimony.

 b. *Discussion*

In *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465 [122 Cal.Rptr. 61], the Court of Appeal concluded a psychiatrist appointed to examine a defendant for competency could not testify later on the question of the defendant's sanity. The court reasoned that because a defendant may not invoke his right against compelled self-incrimination in an examination for competency, "neither the statements of [the defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [the defendant's] guilt, under either the plea of not guilty or that of not guilty by reason of insanity." (*Id.* at p. 470.) Such judicially declared immunity was "reasonably to be implied from the code provisions. The purpose of [an] inquiry [into competency] is not to determine guilt or innocence. It has no relation to the plea of not guilty by reason of insanity. Rather, the sole purpose . . . is the humanitarian desire to assure that one who is mentally unable to defend himself not be tried upon a

---

[18]Section 1026 governs trial of a criminal defendant who enters a plea of not guilty by reason of insanity.

criminal charge. This purpose is entirely unrelated to any element of guilt, and there is no indication of any legislative intent that any result of this inquiry into a wholly collateral matter be used in determining the issue of guilt. . . . Both humanitarian and practical considerations call for a judicially declared immunity." (*Id.* at p. 469.)

We cited *Tarantino v. Superior Court, supra,* 48 Cal.App.3d 465, with approval in *Daly v. Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193], and then formally adopted its judicially declared rule of immunity in *People v. Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338] (*Arcega*).[19] In *Arcega*, we expressly rejected the People's argument that *Tarantino* was incorrect, explaining the rule of immunity "is necessary to ensure that an accused is not convicted by use of his own statements made at a court-compelled examination. The rule also fosters honesty and lack of restraint on the accused's part at the examination and thus promotes accuracy in the psychiatric evaluation. Hence, the rule protects both an accused's privilege against self-incrimination and the public policy of not trying persons who are mentally incompetent." (*Arcega, supra,* at p. 522; see *People v. Williams* (1988) 44 Cal.3d 883, 934 [245 Cal.Rptr. 336, 751 P.2d 395] [noting the rule in *Arcega*]; *People v. Harris* (1987) 192 Cal.App.3d 943 [237 Cal.Rptr. 747] [following *Tarantino* and *Arcega*].)

Our decision in *Arcega* also described the federal constitutional dimension to the rule prohibiting a psychiatrist from testifying to statements made in a custodial mental competency examination. "Not only was the admission of the testimony of [the examining psychiatrist] a violation of state law, but as a recent United States Supreme Court decision establishes, it violated the federal Constitution as well. (*Estelle v. Smith* [(1981)] 451 U.S. 454 [101 S.Ct. 1866, 68 L.Ed.2d 359].) In that case, the high court ruled that the Fifth Amendment privilege against self-incrimination is generally applicable to custodial mental competency examinations, and specifically discussed the provision of immunity for statements made during such examinations. (*Estelle v. Smith, supra,* 451 U.S. at pp. 466-469 [68 L.Ed.2d at pp. 371-373].) The court ruled that a state may not introduce at the penalty phase of a capital case, evidence of statements made by an accused at a custodial mental competency examination unless the accused has been informed of and has waived his *Miranda*[20] rights. In the absence of a valid waiver, the statements could only be used at the hearing on competency." (*Arcega, supra,* 32 Cal.3d at p. 523, fns. omitted.)

---

[19]Coincidentally, *Arcega* was filed one day after the hearing in this case in which the trial court declared a doubt as to defendant's competence and appointed Drs. Cutting and Criswell in an improper dual capacity.

[20]*Miranda, supra,* 384 U.S. 436.

It is thus clear that the testimony of Dr. Cutting and Dr. Criswell was not admissible at the sanity phase of trial because defendant was not permitted to invoke his constitutional right against compelled self-incrimination before he spoke to the doctors. But because defense counsel did not object on this ground,[21] the question of the admissibility at the sanity phase of the two psychiatrists' testimony was not properly preserved for appeal. (*People v. Collie* (1981) 30 Cal.3d 43, 49 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776] [failure to object waived evidentiary claim based on right against self-incrimination]; Evid. Code, § 353.) Nevertheless, defendant's fallback position that his defense counsel was constitutionally ineffective for failing to object requires that we grapple with the issue. As we explain, the erroneous admission of the psychiatric testimony does not require reversal.

As noted, *ante*, the question whether counsel is constitutionally ineffective comprises two inquiries: (1) Was counsel's performance deficient? and (2) was there prejudice? (*Strickland v. Washington, supra*, 466 U.S. at p. 687 [104 S.Ct. at p. 2064]; *People v. Jennings, supra*, 53 Cal.3d at p. 357.) We explained in *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008 [30 Cal.Rptr.2d 818, 874 P.2d 248], however, that "[i]f a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient."

That rule is applicable here, for defendant fails to demonstrate prejudice. Numerous expert witnesses testified at the sanity phase of trial and several of them (other than Dr. Cutting and Dr. Criswell) expressed the opinion that defendant was not insane or did not suffer from a mental disease or defect. Neither Dr. Cutting nor Dr. Criswell learned information from defendant during their competency examinations that was not available to the other expert witnesses in their respective examinations of defendant. Although defendant argues "it is easy to see how [the] corroborating testimony [of Drs. Cutting and Criswell] tipped the scales and hurt [defendant] irreparably" at the sanity phase, the scales were not closely balanced, as evidenced by the fact the jury took less than one hour to find defendant had failed to carry his burden of demonstrating he was insane at the time of the crimes. The further revelation from Dr. Criswell that defendant posed a danger in the future was no doubt unsurprising to the jury given the facts of the case and was not the "highly inflammatory" information defendant claims it to be.

Moreover, the testimony of Drs. Cutting and Criswell was not uniformly negative. Although Dr. Cutting concluded defendant was not insane, he

---

[21]Indeed, the record shows Mr. Huffman affirmatively asked that the psychiatrists appointed to examine defendant for competency also evaluate him for sanity.

testified defendant suffered from a schizoid personality disorder and that defendant probably did experience hearing voices in his head. Dr. Criswell testified defendant endured an "extremely pathological family," which could have formed the basis of his developing a mental condition as an adult.

We thus conclude that while permitting Dr. Cutting and Dr. Criswell to testify at the sanity phase was error, the error was not preserved for appeal, nor was counsel constitutionally ineffective for failing to object. (See *People v. Williams, supra,* 44 Cal.3d at p. 934 [finding the same error harmless]; *Williams v. Vasquez* (E.D.Cal. 1993) 817 F.Supp. 1443, 1466 [same].)

Defendant further contends the trial court lacked jurisdiction to appoint Drs. Cutting and Criswell to examine him for sanity because a doubt had been declared as to his competence, thereby depriving the trial court of jurisdiction to proceed with any other substantive matter until defendant's competence had been decided. (*People v. Marks, supra,* 45 Cal.3d at p. 1337.) He also argues he did not forfeit this issue by failing to object because the claim relates to the trial court's jurisdiction, an issue that can be raised at any time. Even assuming for argument defendant is correct as to both these points, the most we may conclude is that the trial court should not have appointed the two psychiatrists for the purpose of examining defendant's sanity, and thus the information they acquired in their examination was not admissible at the sanity phase. As we explained, *ante,* however, permitting the doctors to testify at the sanity phase, if error, was harmless. Accordingly, even if the trial court lacked jurisdiction to appoint Drs. Cutting and Criswell for purposes of a sanity examination, this fact provides no basis to reverse the sanity verdict.

Defendant's further contention that the appointment of Drs. Cutting and Criswell to examine him for sanity was reversible error because he had not yet formally entered a plea of not guilty by reason of insanity likewise fails for lack of prejudice.

To the extent defendant also claims counsel was ineffective for disclosing to the prosecutor, at the time a doubt was declared as to defendant's competence, that defendant had undergone a similar examination in an earlier trial, we reject the argument, for it seems extremely unlikely the prosecution was unaware of defendant's trial in Ventura County for similar crimes committed just months after the murders of Radford and Levoy. The record thus fails to demonstrate prejudice flowing from counsel's alleged mistake. (*People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1008.)

Finally, to the extent defendant contends the erroneous dual appointment and testimony of Drs. Cutting and Criswell deprived him of a fair and

reliable penalty phase verdict, we reject that claim as well because it is not reasonably possible that, in the absence of the jury's consideration of their testimony at the penalty phase, the jury would have reached a different verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### 8. *Appointment of Drs. Burdick, Criswell, Cutting and Matychowiak Was Unlawful*

 Defendant contends the trial court's appointment of Drs. Burdick, Criswell, Cutting and Matychowiak to examine him for the sanity phase was improper because he never personally pleaded not guilty by reason of insanity. He also claims he was never informed of the rights he was waiving by so pleading. As a result, he claims, the sanity phase was a nullity. He argues that holding the allegedly unauthorized sanity phase prejudiced him by permitting the jury to hear testimony from the four expert witnesses that could later be used as aggravating evidence at the penalty phase. He thus claims we must reverse the penalty judgment as well as the sanity judgment. We disagree with the premise of this claim because the record shows defendant personally entered a valid insanity plea.

Although defendant is correct that a criminal defendant must enter a plea of not guilty by reason of insanity personally and in open court (§§ 1018, 1016; *People v. Gauze* (1975) 15 Cal.3d 709, 717 [125 Cal.Rptr. 773, 542 P.2d 1365]; *People v. Gaines* (1962) 58 Cal.2d 630, 636 [25 Cal.Rptr. 448, 375 P.2d 296], disapproved on another point by *People v. Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *People v. Vanley* (1974) 41 Cal.App.3d 846, 854-855 [116 Cal.Rptr. 446]), the record reveals that defendant did so.[22] On April 13, 1984, defense counsel informed the court defendant wished to enter an additional plea. The following then occurred:

"BY THE COURT: Q Mr. Weaver, the second count of Information No. 24387 charges you with the crime of a violation of Section 187 of the Penal Code which is murder. How do you plead to that charge?

"THE COURT: Do you want to add an additional plea?

"MR. HUFFMAN: Add an additional plea of not guilty and not guilty by reason of insanity.

"BY THE COURT: Q *Is that correct, Mr. Weaver?*

---

[22]We thus reject respondent's apparent concession that defendant failed to personally enter a plea.

"A *Yes*." (Italics added.)

Defendant's verbal assent to the court's questioning, done in open court, was sufficient to satisfy section 1018's requirement that a defendant personally enter his plea. (See *People v. Reeves* (1966) 64 Cal.2d 766, 772 [51 Cal.Rptr. 691, 415 P.2d 35] ["Although the words of the plea were spoken by defense counsel, the trial judge questioned defendant personally in open court and defendant voiced his concurrence therein. This is sufficient compliance with the requirement of Penal Code section 1018 that 'every plea must be put in by the defendant himself in open court' "].) Because defendant personally entered a plea of not guilty by reason of insanity to the charge of Levoy's murder,[23] we reject defendant's claim the appointment of experts to examine him was invalid.

We also reject defendant's subsidiary claim that he was not advised of his *Boykin-Tahl*[24] rights when he entered his plea of not guilty by reason of insanity. Had defendant entered the solitary plea of not guilty by reason of insanity, he would have "thereby admit[ted] the commission of the offense charged" (§ 1016), requiring the court to have advised him of his *Boykin-Tahl* rights before allowing him to so plead. (*People v. Rizer* (1971) 5 Cal.3d 35, 36 [95 Cal.Rptr. 23, 484 P.2d 1367]; *People v. Snow* (1977) 72 Cal.App.3d 950, 960, fn. 5 [140 Cal.Rptr. 427], disapproved on another point, *People v. Wetmore* (1978) 22 Cal.3d 318, 323-324 & fn. 5 [149 Cal.Rptr. 265, 583 P.2d 1308].) This rule does not apply to defendant because he pleaded both not guilty by reason of insanity *and not guilty*. Because he did not admit any element of the charged crimes and was not giving up any rights, there was no need to advise him of those rights. Moreover, the record here shows counsel waived defendant's right to have the trial court advise him of his rights and later waived readvisement of defendant's "constitutional and statutory rights" at a hearing in which the information was amended.

In sum, we find the trial court did not trench upon any state or federal constitutional or statutory right of defendant when it appointed Drs. Burdick, Criswell, Cutting and Matychowiak to examine defendant for the sanity phase. There being no error, we need not address defendant's further claims

---

[23]The record indicates that when, on May 14, 1984, defendant later changed his plea on counts 1 and 3 (the Radford murder and the Levoy kidnapping, respectively) to not guilty by reason of insanity, he may not have done so personally. Nevertheless, even a single valid plea was sufficient to authorize appointment of the experts, and to the extent defendant argues his plea on counts 1 and 3 was defective, that claim was not preserved for appeal and, in any event, any error is harmless. (*People v. Williams* (1988) 45 Cal.3d 1268, 1306 [248 Cal.Rptr. 834, 756 P.2d 221].)

[24]*Boykin v. Alabama, supra*, 395 U.S. 238; *In re Tahl, supra*, 1 Cal.3d 122.

that the unauthorized appointment and testimony of the four doctors denied him fundamental fairness at the penalty phase, and that defense counsel was constitutionally ineffective for failing to object to the appointment of, and testimony of, the four doctors.

### 9. *Taking Evidence in Defendant's Absence*

Defendant next contends his sanity and penalty phase verdicts must be reversed because he was absent from court during the sanity phase when the two videotapes of defendant answering the VESI were played for the jury. He claims his absence violated his state and federal constitutional rights to due process, confrontation, an impartial jury, and a reliable determination of his guilt and penalty. In addition, he contends his personal waiver of his presence was invalid for a variety of reasons, discussed below. He also claims his absence violated sections 977 and 1043. Finally, he argues these errors deprived the jury of meaningful evidence that it could have considered in his favor at the penalty phase, requiring we reverse the penalty judgment as well as the sanity judgment. As we explain, we reject all of these claims.

#### a. *The facts*

Two videotapes showing defendant's responses to the VESI were played for the jury at the sanity phase. After the first tape was played and the jury left the courtroom for a scheduled recess, the following occurred:

"THE COURT: The record should note that approximately five minutes prior to the recess just taken and during the playing of a portion of the video tape the defendant requested that the guards accompany him out of the courtroom; the defendant appear[ed] to become emotional[ly] disturbed or distraught in someway [*sic*] and so—I understand at this time he wants to waive his appearance during that approximate[ly] five minute time and also waive his presence for the balance of the playing of the tape[s].

"MRS. HUFFMAN: That's correct, your Honor.

"THE COURT: Okay. That includes this afternoon and also tomorrow morning, if necessary.

"MRS. HUFFMAN: Until the tapes are finished Mr. Weaver wishes to have his presence—wants to waive his presence.

"THE COURT: Okay.

"MRS. HUFFMAN: He didn't want to lose control and he wants to apologize to the court for that, but he can't handle it.

"THE COURT: All right. First of all, do you join in that request, Mrs. Huffman?

"MRS. HUFFMAN: Yes, I do, your Honor.

"THE COURT: Mr. Weaver, I discussed this with you last week when I was starting to view the films preliminarily, so I have explained to you your right to be present at all phases of the case; okay?

"THE DEFENDANT: Yes, sir.

"THE COURT: Okay. You understand that by law or by Constitution you have the right to be present during all proceedings in this case. Nevertheless, you may waive that right and consent that we proceed in your absence, which is, as I understand, what you wish to do and you wish to have us complete the showing of these tapes without your presence, after which time you will be brought back in and be here for the balance of the trial. [¶] Is that correct?

"THE DEFENDANT: Yes, your Honor. I am sorry about what happened.

"THE COURT: You need not apologize and I will then take that as a waiver of your personal presence for the balance of the time it takes us to play the tapes.

"THE DEFENDANT: Thank you."

b. *Discussion*

"A defendant has the right, under the Sixth Amendment of the federal Constitution, to be present at trial during the taking of evidence. [Citations.] Nonetheless, . . . 'as a matter of both federal and state constitutional law, . . . a capital defendant may validly waive presence at critical stages of the trial.' [Citation.]" (*People v. Jackson* (1996) 13 Cal.4th 1164, 1209-1210 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Because the record demonstrates defendant waived his constitutional right to be present, we reject his claim to the contrary under both the state and federal Constitutions.

Defendant contends his waiver was invalid because it was neither knowingly nor intelligently given, in that he was not advised of the importance of his personal presence before he waived it. He argues "he was not admonished by the court or counsel as to the significant impact his presence and

demeanor would have on the jury which was looking for signs of humanity and remorse in [defendant]." Moreover, given his history of mental problems, defendant contends the court was obligated to conduct "an extensive inquiry to determine whether [defendant] actually understood the significance and consequences of his decision."

Defendant cites no authority for his argument that we must apply a heightened waiver standard under the circumstances, or that the trial court had a sua sponte duty to admonish him of the importance of his decision to absent himself from the courtroom. Defendant was represented by counsel, and he himself chose, for his own reasons, to leave the courtroom. We find nothing improper about the procedure used, and we conclude defendant's waiver of his state and federal constitutional right to be present at this phase of his capital trial was both voluntary, knowing and intelligent.

Defendant is on firmer ground in arguing his absence violated sections 977 and 1043. Section 977, subdivision (b)(1) states: "In all cases in which a felony is charged, the accused shall be present . . . during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present *at all other proceedings* unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present." (Italics added.) Section 1043, subdivision (b) states: "The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶] (1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom. [¶] (2) Any prosecution for an offense *which is not punishable by death* in which the defendant is voluntarily absent." (Italics added.)

We have explained that "when read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1). However, section 977, subdivision (b)(1), the subdivision that authorizes waiver for felony defendants, expressly provides for situations in which the defendant cannot waive his right to be present, including during the taking of evidence before the trier of fact. Section 1043, subdivision (b)(2), further makes clear that its broad 'voluntary' exception to the requirement that felony defendants

be present at trial does not apply to capital defendants. Thus the trial court, by permitting a nondisruptive capital defendant to be absent during the taking of evidence, committed error under sections 977 and 1043." (*People v. Jackson, supra,* 13 Cal.4th at p. 1210.) "The Legislature evidently intended that a capital defendant's right to voluntarily waive his right to be present be severely restricted." (*Id.* at p. 1211.)

The error being merely statutory, however, we will reverse the judgment only if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People v. Watson*[, *supra*] 46 Cal.2d 818, 836 . . . .)" (*People v. Jackson, supra,* 13 Cal.4th at p. 1211.) In this case, no live witnesses testified in defendant's absence, reducing the potential value of any assistance defendant could have given to defense counsel. Although the jury was deprived of its ability to observe defendant's demeanor during the playing of the video-tapes, it is unclear which way this factor cuts, as defendant apparently was afraid he would become overly emotional before the jury, harming his case. His absence, and the concomitant inability of the jury to observe him, may actually have helped him. In any event, such speculation does not support a finding that it was reasonably probable defendant would have achieved a more favorable sanity or penalty phase verdict had he been forced to appear before the jury against his will. Any state law error was thus harmless under *People v. Watson, supra,* 46 Cal.2d at page 836. The speculative nature of any possible harm defendant suffered by his absence also precludes a finding the error affected the penalty phase verdict in any way.

### 10. *Special Jury Instruction Concerning Mental Disease or Defect*

The prosecution proposed a special jury instruction for the sanity phase: "The terms 'mental disease' or 'mental defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." The instruction was taken from our opinion in *People v. Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], which in turn adopted it from subdivision (2) of the American Law Institute test for insanity. (*Fields, supra,* at pp. 368-369.) Defense counsel objected on the ground that *Fields* was not the applicable law at the time of the offense, and could not be applied retroactively to defendant's case. Although she asserted the instruction was "misleading," she did not explain why. The trial court overruled the defense objection and delivered the instruction.

 Defendant now contends the trial court erred by failing to also deliver, sua sponte, another instruction further explaining the prosecution's special instruction using additional language from our *Fields* opinion. Thus,

defendant argues the trial court erred by failing to have instructed the jury that "[i]f that illness manifests itself in some other way as well, then it can be considered as a 'mental disease' . . . and instances of criminal or antisocial conduct can be ascribed to that disease or cited as evidence of its severity." (*People v. Fields, supra,* 35 Cal.3d at p. 369.)

We disagree. As defendant admits, "when terms have no technical meaning peculiar to the law, but are commonly understood by those familiar with the English language, instructions as to their meaning are not required." (*People v. Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].) In this case, the language of the special instruction ("does not include an abnormality manifested *only by* repeated criminal [conduct]" (italics added)) clearly implies that where evidence of *more than* mere criminal conduct is present, such evidence can be considered as proof of a mental disease or defect. Here there was ample evidence presented to the jury at the sanity phase of the voices defendant said he heard in his head, his posttraumatic stress as a result of service in Vietnam, and other psychological problems. The jury would reasonably have understood that such evidence, if credited, coupled with the evidence of repeated antisocial behavior, could comprise evidence of insanity. Because the meaning of the prosecution's special instruction was clear, the trial court bore no sua sponte duty to give an additional instruction further explaining it.

Defendant also contends counsel was ineffective for failing to request an explanatory instruction. Because the prosecution's special instruction was sufficiently clear, however, counsel's failure to seek an additional explanatory instruction could not have been prejudicial. Hence, counsel was not ineffective for failing to request more. (*People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1008.) Moreover, because we find the prosecution's special instruction was not misleading, we reject defendant's further argument that his sanity and penalty phase verdicts were rendered unreliable in violation of the state and federal Constitutions.

Finally, we also reject defendant's additional apparent contention, raised with no supporting argument, that the instruction impermissibly lightened the prosecution's burden. It was defendant who bore the burden of proving his insanity. (*People v. Coddington, supra,* 23 Cal.4th at p. 608; see also *People v. Earp, supra,* 20 Cal.4th at p. 884 ["we need not consider on appeal mere contentions of error unaccompanied by legal argument"].)

11. *Consideration of Guilt Phase Evidence at the Sanity Phase*

At the close of the sanity phase of the trial, the trial court instructed the jury as follows: "In your consideration of the issue of legal insanity or

legal sanity, you are limited to the evidence produced in this phase of the trial. [¶] You may not consider the evidence produced in the guilt phase of the trial." The trial court gave this instruction at defense counsel's request.

Defendant contends the instruction was erroneous and deprived him of his federal constitutional due process right to present a defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [106 S.Ct. 2142, 2146-2147, 90 L.Ed.2d 636] ["the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' "].) He is correct to the extent that he claims the instruction is contrary to law: section 190.4, subdivision (d) provides: "In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial, including any proceeding under a plea of not guilty by reason of insanity pursuant to Section 1026[,] shall be considered a[t] any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase."

Although the instruction was erroneous under section 190.4, subdivision (d), the record reveals counsel made a deliberate choice to request the instruction; hence, the error was invited. Consequently, we need not decide whether the instruction deprived defendant of his constitutional right to present a defense: "The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction." (*People v. Lucero* (2000) 23 Cal.4th 692, 723 [97 Cal.Rptr.2d 871, 3 P.3d 248], quoting *People v. Wader* (1993) 5 Cal.4th 610, 658 [20 Cal.Rptr.2d 788, 854 P.2d 80].)

Even were we to assume the error was not invited, defendant's due process right to present a defense was not infringed. Defendant presented a thorough and detailed defense at the sanity phase and was not prevented from reintroducing those portions of the guilt phase evidence he believed could be beneficial to his case at the sanity phase. Accordingly, he was not denied a meaningful opportunity to present a defense.

Defendant argues that, to the extent Mrs. Huffman's decision to request the instruction bars consideration of the issue, she was ineffective under the state and federal Constitutions. Counsel's deficient performance was exacerbated, defendant claims, by her failure to reintroduce critical guilt phase evidence at the sanity phase to permit the jury to consider it as a factual basis for the opinions of the various expert witnesses who testified. In particular, he directs our attention to guilt phase evidence that he "blanked out" when Levoy bit him, that when he was young his mother would discipline him by

biting him, that he hears voices in his head, that he abused amphetamines to stay awake while driving, and that he had not slept in 10 days when he came upon Radford and Levoy on the highway.

We reject the claim defense counsel was ineffective, because defendant suffered no possible prejudice from counsel's choice to request a jury instruction limiting the jury's consideration to evidence presented in the sanity phase only. In light of the overwhelming negative evidence against defendant presented in the People's case-in-chief at the guilt phase, including gruesome details of the actual crimes, we conclude defendant could not have been prejudiced by counsel's decision.

To the extent defendant's appellate counsel argues the instruction limiting consideration of evidence to that presented at the sanity phase, combined with the instruction requested by the prosecution that evidence of antisocial acts alone cannot comprise evidence of insanity (*ante*, pt. II.B.10.), deprived defendant of a viable defense at the sanity phase, we reject that claim as well because there was ample evidence of defendant's alleged insanity apart from his antisocial acts from which the jury could have concluded he was legally insane.

12. *Alleged Ineffective Assistance of Counsel: Closing Argument at the Sanity Phase*

 Defendant contends his defense counsel, Donnalee Huffman, was constitutionally ineffective for giving an inadequate closing argument at the sanity phase. (*People v. Williams* (1997) 16 Cal.4th 153, 218-219 [66 Cal.Rptr.2d 123, 940 P.2d 710]; cf. *Herring v. New York* (1975) 422 U.S. 853, 859 [95 S.Ct. 2550, 2554, 45 L.Ed.2d 593] [state law granting trial court power to deny counsel any opportunity for closing argument violative of the Sixth Amendment].) He argues counsel was "unprepared and insufficiently experienced to take sole charge of this complex and technically difficult phase of the trial" and that "[h]er closing argument was punctuated with admissions that she was tired and that she did not understand important concepts addressed in the expert testimony." He claims her argument was "rambling, unfocused and laced with irrelevant information," that she failed to "argue or call the jury's attention to important testimony supporting [defendant's] insanity defense," and that she "failed to explain the relevant law or to integrate it with the evidence."

We disagree. Defense counsel attempted to summarize the sanity phase evidence by making the following points: (1) Dr. Cholet's testimony should be discounted because, although she was of the personal opinion defendant

was sane, she did not know the legal definition of insanity; (2) that all the experts believed that schizophrenia had a genetic component (supporting the conclusion that defendant was probably schizophrenic); (3) that no experts ruled out the possibility that defendant heard voices in his head; (4) that it was likely defendant was telling the truth about the voices because there was evidence he had told people about the voices well before his arrest for these crimes; (5) that evidence defendant sometimes appeared somewhat lucid did not preclude a finding he was insane at the time of the crimes; (6) that the jury should look at the total picture to decide the question of sanity or insanity; (7) that Dr. Wilson's views on whether defendant suffered from PTSD as a result of his service in Vietnam carried greater weight than the views of some of the other experts because he had observed defendant for a longer time; (8) that Dr. Wilson's and Dr. Kormos's views deserved greater weight because they had more experience in their respective fields; (9) that the jury should not discount Dr. Shonkwiler's views merely because he had a problem with his professional license because, despite the problem, he had made a proper diagnosis; (10) that the views of Drs. Shonkwiler, Wilson and Kormos deserved greater weight because they were the only ones who had interviewed defendant's mother and sister; (11) that even the People's experts (Drs. Criswell, Burdick, Matychowiak and Cutting) all agreed defendant had endured an abusive childhood; (12) that, when considering whether defendant had had an abusive childhood, the jury should consider the point of view of the child, not the mother; (13) that the jury should not credit the prosecutor's suggestion that defendant did not suffer from hallucinations merely because his alleged hallucinations were not "grandiose"; (14) that the mere fact an expert witness has testified numerous times does not necessarily mean his or her opinion is more believable than the opinion of a witness who has testified fewer times; (15) that Dr. Owre testified that he thought defendant was out of touch with reality just by looking at him in the courtroom; (16) that mental illness can get worse over time; (17) that someone can be suffering from schizophrenia and not be a "raving lunatic"; (18) that the jury should recall that Dr. Chappell testified that an insane person would not remember what happened at the time of the crime, but then did not have a good answer when asked about defendant's claim he "blacked out" when Levoy bit him and that he had no memory of strangling her; (19) that the jury should consider the evidence of schizophrenia, personality disorder, and PTSD together "as a total picture"; (20) that defendant's loss of control and killing Radford when the victim started screaming, and then returning to Levoy and making her sit as if she were a Vietnamese prisoner, was consistent with the conclusion defendant was suffering from PTSD; and (21) that the stress of the situation pushed defendant over the edge and into a psychotic state.

Defense counsel concluded her argument by comparing defendant's mental state to someone in a bed covered by many blankets. She explained that

some expert witnesses saw only the top blanket, which she said represented defendant's antisocial behavior. Other doctors peeled off additional blankets and found deeper layers of psychosis or personality disorders. Counsel urged the jury to take off all the blankets to find out defendant's true nature: "just don't stop with the top blanket, but you get down to the bottom blanket and you put them all together. . . . [¶] You will find and you will come back with the fact that Mr. Weaver was insane at the time of these crimes. Thank you very much."

As is clear, defense counsel's closing argument did not fall below "an objective standard of reasonableness" under prevailing professional norms. (*Strickland v. Washington, supra,* 466 U.S. at p. 688 [104 S.Ct. at p. 2064].) We thus reject the argument counsel was ineffective under both the state and federal Constitutions. Because there was no violation of defendant's right to effective counsel, there can be no resulting deprivation of his Eighth Amendment right to a fair and reliable penalty determination; accordingly, we reject that claim as well.

### 13. *Quick Sanity Phase Verdict*

Defendant contends he was denied his right to due process, a fair trial, and to be free of cruel and unusual punishment under the state and federal Constitutions by the short duration of the jury's deliberations following the sanity phase of the trial. After presentation of numerous witnesses, expert and lay, over six weeks, raising issues of insanity, mental illness, irresistible impulse, amphetamine abuse, PTSD and child abuse, the jury returned a verdict finding defendant sane after only 42 minutes. Because the jury deliberated for so short a time, defendant claims, we can and should infer the jury failed to fairly and seriously consider the evidence before reaching a verdict, requiring we reverse both the sanity and penalty phase judgments.

The trial court addressed this issue in denying the motion for a new trial.[25] The court opined: "First of all, it has been contended that the trial took six weeks. Well, in fact it did, spread out over about six weeks, but in my reviewing my trial notes, there were 16 days of testimony, and some of those

---

[25]Following this verdict, defendant moved for a new trial pursuant to Penal Code section 1181, claiming the sanity verdict had been "decided by lot, or by means other than a fair expression of opinion on the part of all the jurors." The motion was denied without prejudice and then later denied when counsel renewed it. To the extent defendant contends there was evidence some of the jurors did not take the sanity phase seriously after considering the guilt phase evidence, or applied an incorrect standard of proof at the sanity phase, that evidence was not properly placed before the trial court and was inadmissible in any event (Evid. Code, § 1150), as even defendant seems to admit.

were partial days because of the unavailability of witnesses at various times. Much of the testimony that was given by some of the witnesses was, shall we say, foundational or background material, really did not . . . bear directly on the specific issue to be decided by the jury, that is, whether or not the defendant was insane when he committed the three offenses for which he was found guilty. And as pointed out by both counsel, it is abundantly clear by the evidence, and indeed admitted by both sides, that the defendant did in fact know right from wrong, or, that is, appreciate the criminality of his conduct at the time it was committed, the first prong of the test to be applied, the second prong being whether or not he could conform his conduct to the law. It seems to me that first of all in 43 minutes the jury did have time to discuss certain matters, 42 minutes, whatever it was. Granted, that is not the most lengthy period of deliberation that the Court has observed, but in light of the fact that all of the witnesses were testifying on basically the same issue, and if the jury went into the jury room, and after discussing what the issues were, determined there really was nothing further to discuss because they were all in agreement, it seems to me that the verdict reached in that length of time is a proper verdict [and it] must be sustained."

We agree. As we explained in response to a similar claim that a jury arrived too quickly at a guilty verdict, which the defendant contended indicated the jury improperly considered the possibility of the death penalty at the guilt phase, "[i]t appears much more likely . . . the relatively short duration of the jury's deliberations simply reflected the strength of the prosecution's case." (*People v. Robertson* (1982) 33 Cal.3d 21, 36 [188 Cal.Rptr. 77, 655 P.2d 279]; cf. *People v. Williams, supra,* 16 Cal.4th at p. 229 ["Defendant's mere speculation that his jury cut short its [guilt] deliberations out of prejudice [based solely on the fact that they deliberated for less than two hours] does not establish 'good cause' " to reopen voir dire prior to the penalty phase].) We find defendant was not denied any state or federal constitutional rights by the jury's short sanity phase deliberations.

### III. PENALTY PHASE

#### A. *Facts*

Bonnie Brown testified that on September 22, 1976, she was working as a waitress in Eureka, California. At midnight, as she left work after her shift, a man she later identified as defendant pulled up in a pickup truck and asked her for directions. He then asked her to have a drink or some coffee with him. She agreed, and they went to a Denny's restaurant. He convinced her to go see his big rig truck at a nearby truck stop; they drove their own vehicles there. After seeing the truck, they walked back to their cars. When her back

was turned, defendant hit her on the back of the head with a club. Brown fell and blacked out. When she came to, defendant had his hand over her mouth and told her not to scream or he would kill her. He led her to his pickup truck, still holding what looked like a two- to three-foot-long wooden baseball bat. He forced her into the passenger side of his truck, but she escaped as he walked around to get in the driver's side. She ran to the truck stop and screamed. Defendant was identified and arrested, eventually pleading guilty to assault with a deadly weapon. He served a prison term as a result.

In April 1981, just two months after defendant's crimes against Radford and Levoy, defendant picked up two hitchhikers: David Galbraith, 18 years old, and Michelle D., 15 years old. Both testified against defendant. Galbraith and Michelle D. were from Burlington, Washington, and were running away after Galbraith burglarized a sporting goods store to obtain supplies for their trip. They were headed for Yreka, California, where Michelle D. had an uncle. Defendant agreed to take them there. Defendant's 10-year-old son was riding with defendant that day.

When they arrived in Yreka, Michelle D.'s uncle was not home and not expected back for two weeks. Defendant suggested the couple come with him to his home in Oroville, and they accepted. The young couple stayed with defendant's family for two or three days. They accepted defendant's offer to take them to Ventura on his next trucking run. During the trip, defendant offered to help Galbraith find work. When they arrived in Ventura, defendant and Galbraith unloaded the truck, and then they met someone named Jerry, who defendant said would take Galbraith somewhere where he could get a job. Defendant went on a short delivery run with Michelle D.; they all agreed to meet in a few hours. Before they left, Galbraith saw defendant give Jerry a gun.

After Jerry and Galbraith had been driving about an hour, Jerry stopped the car and called Galbraith to come look at some deer on the side of the road. Jerry then shot Galbraith in the back of the head. After Galbraith fell, Jerry shot him again in the back of the head and then in the face. Jerry kicked him over an embankment and left, without saying anything. Galbraith was conscious throughout the attack and managed to crawl back to the roadway, where he was found by a forest ranger.

After defendant and Michelle D. had driven around for awhile, he stopped and raped her at gunpoint. Keeping her in the truck, he drove around again before forcing her to orally copulate him a few hours later. He told her Galbraith would be killed if she did not cooperate. He eventually returned

with Michelle D. to his home in Oroville. The victim did not try to escape because she feared for Galbraith's life. Defendant released her in Marysville around 5:00 p.m., saying he would return for her at 9:00 p.m. She did not go for help because she was in a state of shock. When defendant did not return at 9:00 p.m., she went to the police.

Defendant testified at the penalty phase and explained that he took his family to Idaho after his assault on Bonnie Brown in 1976, but returned and voluntarily turned himself in when he learned police were looking for him. After his arrest, he sought admission into two Veterans Administration hospitals in Texas but was refused for lack of space.

### B. *Discussion*

#### 1. *Alleged Ineffective Assistance of Counsel at the Penalty Phase*

Defendant contends he was denied his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and to analogous rights under the California Constitution by defense counsel's performance at the penalty phase.

##### a. *Failure to present available mitigating evidence*

Defendant contends counsel, Mrs. Huffman, was constitutionally ineffective for calling only one witness at the penalty phase: defendant himself, who briefly discussed his 1976 assault on Bonnie Brown, explaining he voluntarily turned himself in to police and thereafter unsuccessfully sought treatment at two Veterans Administration mental hospitals in Texas. He claims counsel should have presented evidence from family, friends, and acquaintances from the military and prison to humanize defendant and to show the jury his good side.

We have declined to find reversible error when a capital defendant fails to present mitigating evidence at the penalty phase. (*People v. Diaz* (1992) 3 Cal.4th 495, 566 [11 Cal.Rptr.2d 353, 834 P.2d 1171] [finding "[o]n a silent record, . . . we will not assume that the defense counsel's failure to present mitigating evidence rendered his assistance ineffective"].) Although defendant contends *People v. Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925] supports his argument, and that later cases limiting *Deere* are distinguishable, we rejected that exact claim in *Diaz* as well. (*Diaz, supra*, at p. 566.)

This is not strictly a case in which defendant presented absolutely no mitigating evidence. As noted, he took the stand and explained some of the

circumstances surrounding his assault on Brown. More significantly, he presented a substantial amount of mitigating evidence in the sanity phase, calling numerous expert witnesses who testified defendant suffered, to varying degrees, from schizophrenia, PTSD, and other mental conditions. The jury was aware of that evidence and could have considered it under section 190.3, factors (d) ("Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"), (h) ("Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of [the] law was impaired as a result of mental disease or defect, or the [e]ffects of intoxication"), and (k) ("Any other circumstance that extenuates the gravity of the crime even though it is not a legal excuse for the crime"). We note Mrs. Huffman relied on this evidence and urged the jury, in closing argument, to consider these factors when deciding on the appropriate penalty. In light of the amount of mitigating evidence available to the jury, it is not reasonably probable additional mitigating evidence would have altered the outcome at the penalty phase of the trial. We thus reject defendant's claim counsel was ineffective for failing to present more mitigating evidence.

### b. *Failure to seek second counsel*

Defendant also contends Mrs. Huffman should have sought the assistance of second counsel when she realized Mr. Huffman would not be back to assist her at the penalty phase due to his illness. Defendant argues Mrs. Huffman was exhausted by having to conduct the sanity phase alone, was depressed and feeling rejected after losing at the sanity phase and, "like a prizefighter standing on rubbery legs out on her feet, she was unable to aggressively fight for her client's life." He claims her failure to request help from a second attorney to conduct the penalty phase constituted unreasonably deficient representation.[26]

It is impossible to discern from the appellate record whether defense counsel was so inexperienced, fatigued or depressed that her failure to seek

---

[26]Defendant contends Mrs. Huffman admitted on the record that she did not know what she was doing and was learning as she went along, but it is possible she was exaggerating in an attempt to ingratiate herself with the jury. Thus, in the sanity phase, she told the jury: "It was a learning process not only for you, but it was also a learning process for me, because as this case progressed, as you are well aware, I had to take over the main thrust of it and I had to learn these concepts, and they are not easy concepts to learn." Later, referring to terminology used by one of the expert witnesses, she said the scale to which the witness referred "was new terminology for me and I am sure it was for everyone [*sic*] of you." Although these statements reveal the difficulties of her representation of defendant, we cannot conclude from these statements that Mrs. Huffman was unable effectively to represent defendant at the penalty phase.

second counsel under section 987, subdivision (d) was reversible error. Certainly we may look at counsel's actual performance at trial to determine whether she provided substandard legal representation (but see *People v. Mendoza Tello, supra,* 15 Cal.4th at p. 267), but, absent a request for *Keenan* counsel (*Keenan v. Superior Court, supra,* 31 Cal.3d 424), with counsel making a record about her need for the assistance of second counsel, the facts supporting such a claim must be developed elsewhere. (*People v. Diaz, supra,* 3 Cal.4th at p. 566 ["Any assertion that counsel was inadequate in this regard must be raised on habeas corpus"].)

As we stated in *People v. Anderson* (2001) 25 Cal.4th 543, 598 [106 Cal.Rptr.2d 575, 22 P.3d 347] when addressing a similar claim: "the absence of mitigating character and background evidence is troubling, but the appellate record affords no basis for concluding that the lapse was the result of [an attorney's] incompetent failure to obtain full trial assistance from another attorney. [¶] Similarly, defendant identifies no record evidence, and we discern none, demonstrating a reasonable probability that counsel's mistake, if any, in failing to request full-time second counsel affected the trial outcome. [Citations.] Hence, the claim of ineffective assistance [for failing to seek appointment of a second attorney] must be rejected." As in *Anderson,* we conclude in this case that the record provides no cause to believe a reasonable probability exists that Mrs. Huffman's failure to seek appointment of second counsel affected the jury's decision.

Defendant also argues the trial court should have conducted a searching voir dire to determine whether defendant wished to waive his statutory right to second counsel at the penalty phase. Although he waived this right before the sanity phase, defendant contends his own impaired mental condition required heightened scrutiny and a renewed inquiry by the trial court at that important time of the trial. This claim is a reprise of one already discussed, *ante,* in part II.B.3.b., and defendant adds nothing we have not already considered.

### c. *Delivering an inadequate closing argument*

■ To the extent defendant argues counsel presented an inadequate, "minimalist" closing argument in which she "dehumanized" him rather than portraying him as a person with love for his mother and as a person who had endured a "life . . . marked by intense pain and suffering," we reject the claim. Defense counsel's description of defendant as a "madman" lacking all "impulse controls" was clearly an attempt to convince the jury to consider expert evidence presented at the sanity phase as mitigating under section 190.3, factors (d) and (h).

As we explained in *People v. Cudjo* (1993) 6 Cal.4th 585, 634-635 [25 Cal.Rptr.2d 390, 863 P.2d 635]: "The effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality. Although defense counsel's argument in this case appears to have been somewhat lacking in clarity, not to mention eloquence, we are not persuaded that it fell below the standard of reasonably competent representation or that there is a reasonable probability that a better presentation would have resulted in a more favorable penalty verdict." Here also we find counsel's closing argument, though brief, did not fall below the standard of reasonably competent representation, and we find no reasonable probability exists that a better argument would have convinced the jury to vote for life over death.

In sum, we conclude defense counsel was not constitutionally ineffective at the penalty phase for failing to present additional mitigating evidence, for failing to request second counsel, or for presenting what defendant characterizes as a unreasonably "minimalist" closing argument.

### 2. Jury Instruction Precluding Jury from Considering Defendant's Statements on a VESI Videotape for Their Truth

 As noted, *ante* (pts. II.B.5. & 9.), two videotapes of defendant answering questions from the VESI were played for the jury at the sanity phase. For that phase of trial, the jury was instructed that defendant's answers were not to be considered for their truth but only as demonstrating the basis for some of the medical experts' opinions.[27] That instruction was imported into the penalty phase when the trial court instructed the jury that "all other instructions previously read to you which you find to be applicable to this part of the trial should be considered by you in reaching a decision as to the penalty to be imposed."

After retiring to deliberate, the jury sent out a note, asking about the permissible way it could consider the VESI videotapes. The trial court instructed the jury: "I will simply repeat the instruction that I gave you several times during the course of the trial and the video tape was played in the second phase of the trial. It is received and it may be considered by you only as supplying a part of a basis of this particular doctor's opinion. It may not be used for the truth of anything stated on the video tape, and to the

---

[27]The jury was instructed: "There has been admitted in evidence the testimony of medical experts of statements made to them by the defendant in the course of an examination of the defendant which was made for the purpose of diagnosis. The testimony of such statements may be considered by you only for the limited purpose of showing the information upon which the medical experts based their opinion. Such testimony is not to be considered by you as evidence of the truth of the facts disclosed by defendant's statements."

extent that the doctor's opinion as reflected by the video tape played a part in this decision, yes, it can be used in that manner. But as I say, it is not to be used as the establishing of any fact, the truth of any fact that may have been stated on the tape. Just as when a doctor examines a patient in person and that patient made certain statements to the doctor about his condition, those statements may not be used for the truth of what was told the doctor but simply may be considered as a basis or part of a basis of the doctor's subsequent opinions."

Although defendant did not object to the trial court's initial instruction or its reinstruction, he now complains that both were erroneous, and that defense counsel was constitutionally ineffective for failing to object. We disagree. Defendant's statements on the VESI videotapes were hearsay insofar as they might be considered for their truth, and we have implicitly concluded that, with some exceptions, the hearsay rule applies at the penalty phase of a capital trial. (See *People v. Harris* (1984) 36 Cal.3d 36, 68-71 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn. of Broussard, J.); *id.* at p. 75 (dis. opn. of Kaus, J.); *People v. Ray, supra,* 13 Cal.4th at p. 371 (conc. opn. of Mosk, J.); see *People v. Nye* (1969) 71 Cal.2d 356, 372 [78 Cal.Rptr. 467, 455 P.2d 395] [under the then applicable death penalty law, "[o]bjectionable hearsay evidence is no more admissible at the penalty phase than at the guilt phase"].)

Defendant argues the jury should have been permitted to consider the nonhearsay elements of the videotapes, such as defendant's demeanor, physical reaction to questions, and remorse. We do not read the trial court's instruction as precluding consideration of defendant's demeanor or physical reactions. In any event, even assuming the court erroneously deprived the jury of this "evidence," there is no reasonable possibility the jury would have reached a different verdict in the absence of the alleged error.

Defendant also contends that, given the finality of the death penalty, penalty phase juries should not be "precluded from considering, as a miti-gating factor, any aspect of the accused's character that would permit the jury to return a sentence less than death," citing *Lockett v. Ohio* (1978) 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973]. Stated differently, defendant would have us conclude that, because the death penalty is involved, we should dispense with traditional state-law-based rules of evidence. He cites *Green v. Georgia* (1979) 442 U.S. 95 [99 S.Ct. 2150, 60 L.Ed.2d 738] in support.

We previously addressed and rejected this broad reading of *Green v. Georgia, supra,* 442 U.S. 95, in *People v. Stanley* (1995) 10 Cal.4th 764 [42

Cal.Rptr.2d 543, 897 P.2d 481]. In that case, the defendant claimed the trial court erred by refusing to modify an instruction so as to permit the jury to consider for their truth certain videotapes defendant had made while under the influence of sodium amytal. (*Id.* at p. 833.) We considered the rule of *Green v. Georgia*, in which the high court held that due process concerns could override state evidentiary rules at the penalty phase of a capital trial in circumstances where the evidence in question was highly relevant and reliable. (*Stanley*, *supra*, at pp. 838-839.) We concluded the videotapes bore no special indicia of reliability, so the rule did not require the trial court to dispense with the hearsay rule.

Although we have recognized the potential importance of *Green v. Georgia*, *supra*, 442 U.S. 95, explaining that "[e]xclusion of hearsay testimony at a penalty phase may violate a defendant's due process rights if the excluded testimony is highly relevant to an issue critical to punishment *and* substantial reasons exist to assume the evidence is reliable" (*People v. Phillips* (2000) 22 Cal.4th 226, 238 [92 Cal.Rptr.2d 58, 991 P.2d 145]), the rule is not implicated in this case. The VESI videotapes were made by defendant to support his claim of insanity, and we cannot conclude they were particularly reliable as a result. Although defendant claims their reliability was shown by the testimony of other witnesses confirming that he had served in Vietnam and came home a changed person, we agree with respondent that such evidence shows only that defendant's assertions on the videotapes that he had served in Vietnam were not lies. The testimony of other witnesses cannot confirm the substance of defendant's war experiences, which is the aspect of his VESI responses that he claims is mitigating.

In any event, even assuming for argument that the trial court should not have instructed the jury that it could consider the VESI videotapes only for a limited purpose, we agree with respondent that any error was harmless because the videotapes included potentially aggravating evidence. As defendant argued earlier when he claimed counsel was ineffective for eliciting damaging evidence on the videotapes and then failing to seek a redaction before they were played for the jury, the videotapes included such information as defendant's saying women existed for his sexual satisfaction, that he hated all women except his mother, and that he had raped other women. These statements, if made available to the jury for their truth, could only have emboldened the jury to impose the death penalty.

We conclude the trial court did not err in limiting the jury's consideration of the VESI videotapes to using them as a basis for the expert psychiatric testimony. "Any contrary ruling would have permitted defendant to give self-serving testimony free from cross-examination as to its validity."

(*People v. Stanley, supra*, 10 Cal.4th at p. 839.) Even assuming the instruction was erroneous, defendant was not prejudiced thereby. It follows that counsel was not ineffective for failing to object to the instruction.

### 3. *Failure to Give Clarifying Jury Instructions*

As noted above, the trial court instructed the jury that "all other instructions previously read to you which you find to be applicable to this part of the trial should be considered by you in reaching a decision as to the penalty to be imposed." Defendant contends the trial court's failure to enumerate specifically which of the sanity phase jury instructions applied at the penalty phase was reversible error. In particular, he claims that by leaving the jury to decide which of the sanity phase instructions applied, the jury may have erroneously applied the definition for legal insanity to the penalty phase. This error, defendant claims, would have required him to prove by a higher quantum of evidence that his mental condition deserved consideration as a mitigating circumstance, because former CALJIC No. 4.00 (1978 rev.) asks the jury to determine if the defendant "as a result of mental disease or defect . . . *lacks substantial capacity* either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." (Italics added.) By contrast, section 190.3, factor (h) permits the jury to consider as a mitigating circumstance "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law *was impaired* as a result of mental disease or defect, or the [e]ffects of intoxication." (Italics added.)

Defendant is correct that the trial court's failure to specify which of the previously delivered instructions continued to apply at the penalty phase was potentially misleading. We admonished the trial courts in *People v. Babbitt* (1988) 45 Cal.3d 660 [248 Cal.Rptr. 69, 755 P.2d 253] that, "[t]o avoid any possible confusion in future cases, trial courts should expressly inform the jury at the penalty phase which of the instructions previously given continue to apply." (*Id.* at p. 718, fn. 26.) The current applicable pattern instruction, CALJIC No. 8.84.1 (6th ed. 1996), provides that the jury at the penalty phase should "[d]isregard all other instructions given to you in other phases of this trial." In the Use Note to CALJIC No. 8.84.1, the authors explain that the instruction "should be followed by all appropriate instructions beginning with CALJIC 1.01, concluding with CALJIC 8.88. [¶] Our recommended procedure may be more cumbersome than the suggestion advanced in footnote number 26 [of *Babbitt, supra*, at p. 718], but the Committee believes it is less likely to result in confusion to the jury."

Defendant's trial occurred before we decided *People v. Babbitt, supra*, 45 Cal.3d 660, so the trial court did not have the benefit of our admonition. In

any event, regarding the possibility of confusion between the definition for insanity and the mitigating circumstance set forth in section 190.3, factor (h), we rejected the same claim in *People v. Babbitt*, at pages 720-721: "Nor do we agree with defendant that factor (h) suggested to the jury that, having found defendant sane, it could not consider his asserted mental defects or disease in mitigation. Whereas the insanity instruction requires that a defendant lack 'substantial capacity' to appreciate the criminality of his conduct or to conform his conduct to the law, factor (h) requires only that his capacity to do so be 'impaired.' The difference between the two standards is readily apparent." (See *People v. Marshall* (1996) 13 Cal.4th 799, 857 [55 Cal.Rptr.2d 347, 919 P.2d 1280] ["For a particular sentencing factor, such as section 190.3, factor (h), to apply on the record of the case, the evidence supporting it need not suffice to establish a complete defense to the crime; rather, there need be in the record only some evidence relevant to the factor"].)

Defendant argues *People v. Babbitt, supra,* 45 Cal.3d 660 is distinguishable because we there emphasized that "both the prosecutor and defense counsel informed the jury that defendant's mental condition could properly be considered even though the jury had found him to be legally sane." (*Id.* at p. 721, fn. omitted.) By contrast, he claims, "the record reflects that the jury was urged by both parties in closing argument to apply the sanity phase instructions to the penalty phase." For example, he notes the prosecutor "urged the jury to apply the same reasoning it had employed in the sanity phase to its assessment of mitigating factors in the penalty phase."

Defendant exaggerates the record. When the prosecutor asserted in closing argument that the section 190.3, factor (h) analysis was "[b]asically . . . a review of the sanity phase in the case," he was likely not urging the jury to apply the same *level of proof.* Instead, he appeared to be urging the jury to find there was *insufficient persuasive evidence* showing defendant suffered a mental disease or defect. "The only thing I am going to say with regard to that is I don't think there is evidence to support it. There was an attempt made to present evidence showing that. I think that evidence failed in that regard for the reasons that I have stated earlier in my argument." The prosecutor reminded the jury that, during voir dire, the jurors affirmed that they "could consider [mental disease or defect as a mitigating factor] even though the defendant might be sane." Although the prosecutor could have more clearly explained the difference in the standard of proof between legal insanity ("substantial capacity") and factor (h) ("impaired"), we conclude the prosecutor did not mislead the jury.

Defense counsel also could have clarified the differences between insanity and section 190.3, factor (h) but, like the prosecutor, she did not. Contrary to

defendant's claim, however, neither did she affirmatively mislead the jury. She accurately quoted the statutory language for the jury (was defendant's "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law . . . impaired as a result of a mental disease or defect . . . ."?) and then reminded the jury that, during voir dire, the jurors all affirmed they could consider evidence of mental disease or defect as a mitigating circumstance even if they had already found defendant was legally sane. She then asked: "Did he have a mental defect? Did he have a mental illness? Did he have an emotional problem that caused some of these factors to happen? I say he did and I think those are very important factors and should be weighed very heavily." This is not an argument to apply the sanity phase instructions to the penalty phase.

Because there was no "reasonable likelihood" (*People v. Avena* (1996) 13 Cal.4th 394, 417 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *Boyde v. California* (1990) 494 U.S. 370, 380-381 [110 S.Ct. 1190, 1197-1199, 108 L.Ed.2d 316]) the jury misunderstood the instructions—because the difference between the standard for insanity and for consideration of evidence under section 190.3, factor (h) was "readily apparent" (*People v. Babbitt, supra*, 45 Cal.3d at p. 721)—we conclude the trial court did not err in failing to specify which of the earlier instructions applied at the penalty phase. Accordingly, defendant's further arguments that the allegedly ambiguous instruction prevented the jury from giving effect to mitigating evidence in violation of his rights under the Eighth Amendment to the federal Constitution, as well as his rights under article I, section 17 of the state Constitution, must fail. We likewise reject his final argument that defense counsel was ineffective for failing to object to the instruction; because we conclude there was no reasonable likelihood the jury was misled, there was no prejudice flowing from the failure to object.

### 4. *Alleged Brown Error*

The trial court instructed the jury in the language of former CALJIC No. 8.84.2 (1979 rev.): "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors or aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

This was the "standard pre-*Brown* mandatory weighing instruction, which quoted the language of the statute." (*People v. Avena, supra*, 13 Cal.4th at p.

440; see *People v. Brown* (1985) 40 Cal.3d 512 [230 Cal.Rptr. 834, 726 P.2d 516], revd. on another issue *sub nom. California v. Brown* (1987) 479 U.S. 538 [107 S.Ct. 837, 93 L.Ed.2d 934].) "We acknowledged in *Brown, supra*, 40 Cal.3d at page 544, footnote 17, that the instruction might in some cases confuse the jury about its role; specifically, the use of the word 'shall' in the standard instructions raised concerns the jury might feel legally obligated to impose the death penalty, rather than appreciating it was to undertake a normative decision to determine whether the death penalty was appropriate. Thus, the jury might improperly view the weighing process as prohibiting an individual juror from assigning 'whatever moral or sympathetic value he deems appropriate' to the mitigating evidence. (*Brown, supra*, at pp. 538-541.) We said we would examine the record in each case to determine whether prejudicial confusion existed." (*People v. Avena, supra*, at pp. 440-441.)

Defendant relies on the prosecutor's use and emphasis in closing argument of the word "shall" and contends such argument, coupled with the potentially misleading pattern instruction, misled the jury into believing it had no choice of penalty once it concluded the aggravating circumstances outweighed the mitigating ones. We disagree. Although the prosecutor used the word "shall," "[n]owhere did the prosecutor urge the jury to merely count the number of aggravating and mitigating factors and mechanically or arithmetically impose the death penalty." (*People v. Sanders* (1990) 51 Cal.3d 471, 522 [273 Cal.Rptr. 537, 797 P.2d 561].) Moreover, the prosecutor informed the jury "[t]hat in the end [the decision] is a moral judgment that each of you will have to make as to the appropriate weight to be ascribed to each of these factors," that "[t]here is no numerical figure that you can place on these [factors]," "[w]hat you have to do is balance, weigh those factors that you determine to be in mitigation, and I submit that there are very few in this case, they are entitled to minimal weight in this case, against the factors in aggravation," and "[t]here are no numbers. You can't go through and say we have put one here, two there. You evaluate it. It is a moral judgment. You have to decide what weight each of these factors is entitled to. Having done that, you weigh them and determine what the appropriate penalty is."

Defense counsel's argument did not contradict the prosecutor's argument on these points, other than to disagree that the aggravating circumstances outweighed the mitigating ones and that death was the appropriate penalty.

There was no *Brown* error.

Defendant makes a number of subsidiary claims under the general category of misleading the jury as to its proper role. As we explain below, we reject them:

(a) Defendant argues that former CALJIC No. 8.84.2 (1979 rev.), coupled with the prosecutor's argument, might have resulted in the jury's failing to understand "the law does not require a verdict of death unless *each juror* [individually] finds that verdict appropriate under all the circumstances." (Italics added.) We disagree; we assume the jury followed the instruction that it was "the duty of *each of you* to consider the evidence for the purpose of arriving at a verdict if you can do so. *Each of you* must decide the case for yourself. . . ." (Italics added.)

(b) Defendant argues some parts of the prosecutor's argument encouraged the jury to treat factors in isolation rather than collectively. In making this argument, defendant extracts the statements from their context. The prosecutor clearly told the jury to weigh all the applicable factors together and then make a "moral" decision.

(c) To the extent defendant claims the prosecutor's emphasis on the absence of "excuse" or "license" encouraged the jury to apply an incorrect standard of proof to the penalty phase, defendant again views the statements in isolation. In any event, we assume the jury followed the instruction on section 190.3, factor (k):[28] the jury should consider "[a]ny other circumstance which extenuates the gravity of the crime *even though it is not a legal excuse for the crime. . . .*" (Italics added.)

(d) To the extent defendant argues the instruction permitting the jury to consider "sympathy or pity for defendant or his family as a circumstance in mitigation" "tended to reduce any impact [of sympathy] by separating it from the factors which aroused it," causing a "compartmentalization of sympathy," and fostered in the jury a misunderstanding of its role (or that the sympathy instruction failed to negate a budding misunderstanding of the jury's role), we note defense counsel passionately asked the jury to consider sympathy as a factor in defendant's favor; to the extent defendant believed the standard sympathy instruction, which was otherwise a correct statement of law, was somehow misleading because it caused a "compartmentalization of sympathy," he should have sought a clarifying instruction. His failure to do so waived that claim. (*People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

(e) To the extent defendant claims the challenged instruction violated his federal right to due process of law under *Hicks v. Oklahoma* (1980) 447 U.S. 343 [100 S.Ct. 2227, 65 L.Ed.2d 175], we reject that as well. (*People v.*

---

[28]This factor was labelled "(j)" in the instructions due to the deletion of statutory factor (j): "Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor."

*Earp, supra,* 20 Cal.4th at p. 884 ["we need not consider on appeal mere contentions of error unaccompanied by legal argument"].)

### 5. *Failure to Instruct on Elements of Assault*

 As a factor in aggravation, the prosecution introduced evidence of defendant's conviction for assault with a deadly weapon stemming from his attack on Bonnie Brown in 1976. Defendant now claims the trial court erred by failing to instruct the jury, sua sponte, on the elements of assault, which he contends "has a technical meaning peculiar to the law . . . not commonly understood by persons familiar with the English language." "We have explained, however, that such an instruction is not required because 'a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes, perhaps because he fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die.'" (*People v. Avena, supra,* 13 Cal.4th at p. 435, quoting *People v. Phillips* (1985) 41 Cal.3d 29, 73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].)

In any event, the evidence shows defendant struck Brown on the back of the head with a wooden baseball bat, rendering her momentarily unconscious. This is thus not a case in which the "technical" definition of the crime of assault was at all relevant, and there is no possibility the jury misunderstood the nature of defendant's crime against Brown. We reject the claim.

### 6. *Alleged Ineffective Assistance of Counsel: Failure to Clarify the Relationship Between Factors (d) and (k)*

 Defendant contends defense counsel was ineffective for failing to clarify for the jury in closing argument that evidence of defendant's mental disturbance that could be characterized as less than "extreme" (see § 190.3, factor (d)) could still be considered mitigating under section 190.3, factor (k) (which the jury was told was factor "(j)"; see fn. 28, *ante*). Factor (k) provides that the jury may consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

Counsel discussed the fact of defendant's mental problems at length during her closing argument and, although she did not specifically refer to section 190.3, factor (k), we assume the jury followed the instructions permitting it to consider defendant's mental problems under factor (k). (See

*People v. Williams, supra,* 16 Cal.4th at p. 256.) In any event, it does not appear reasonably probable the result of the penalty phase would have been different had defense counsel, during her discussion of defendant's mental problems, referenced factor (k) specifically in addition to arguing such evidence was mitigating under section 190.3, factors (d) and (h).

### 7. *Jury Was Misled into Believing It Must Be Unanimous Before It Could Consider a Mitigating Factor*

 Defendant argues the interplay between the sanity phase instruction that "[i]n order to reach *a finding* all twelve jurors must agree to the decision" (italics added), the nearly identical penalty phase instruction requiring unanimity for a penalty verdict, and the penalty phase instruction that "all other instructions previously read to you which you find to be applicable to this part of the trial should be considered by you in reaching a decision as to the penalty to be imposed," led the jury reasonably to believe that no juror could consider a mitigating circumstance unless all 12 jurors agreed the factor was established by the evidence. We disagree, finding it was not reasonably likely the jury understood the instructions in this manner.

"It is settled that a requirement of unanimity improperly limits consideration of mitigating evidence. (*McKoy* v. *North Carolina* (1990) 494 U.S. 433 [108 L.Ed.2d 369, 110 S.Ct. 1227].)" (*People v. Breaux* (1991) 1 Cal.4th 281, 314 [3 Cal.Rptr.2d 81, 821 P.2d 585], italics omitted; see also *Mills v. Maryland* (1988) 486 U.S. 367 [108 S.Ct. 1860, 100 L.Ed.2d 384].) As in *Breaux,* however, "there is no indication that the jury was misled in any respect. There was nothing in the instructions to limit the consideration of mitigating evidence and nothing to suggest that any particular number of jurors was required to find a mitigating circumstance. The only requirement of unanimity was for the verdict itself." (*People v. Breaux, supra,* at p. 315; see also *People v. Coddington, supra,* 23 Cal.4th at p. 641 ["CALJIC No. 8.84.2 . . . was not misleading" on this point].) We note the jury was specifically instructed that each juror must decide the question of penalty individually: "Both the People and the defendant are entitled to the individual opinion of each juror."

We conclude it is not reasonably likely the instructions misled the jury into believing it must find the existence of mitigating factors unanimously before such factors could be considered. We also conclude counsel was not ineffective for failing to object to the penalty phase instructions on this ground.

8. *Intracase Proportionality*

██ Defendant contends the death penalty law is unconstitutional for failure to provide for intracase proportionality review. "Contrary to defendant's insinuation, the cruel or unusual punishment clause of the California Constitution (art. I, § 17) does entitle a capital defendant, on request, to intracase review by this court to determine whether the death penalty is grossly disproportionate to his personal culpability." (*People v. Anderson, supra,* 25 Cal.4th at p. 602, italics omitted; *People v. Avena, supra,* 13 Cal.4th at p. 447.) "We have previously rejected the contention that California's capital sentencing law fails to ensure that arbitrary, discriminatory and disproportionate death sentences are not imposed." (*People v. Marshall, supra,* 13 Cal.4th at p. 865; see *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].)

In this case, defendant picked up a young couple stranded on the highway by car trouble, killed the young man in a sneak attack with a metal pipe, kidnapped and raped his female companion more than once (by his own admission) over the course of several hours, and then killed her as well. He had previously attempted to kidnap a woman by striking her on the head with a baseball bat. A few months after his capital crimes, he picked up another young couple hitchhiking, directed an acquaintance to kill the male (although the victim miraculously survived) and committed forcible sex crimes on his 15-year-old female abductee. We conclude the death penalty was not grossly disproportionate to defendant's crimes.

9. *Automatic Motion for Modification*

██ Defendant contends the trial court violated state law and the federal Constitution by denying his automatic motion for modification of the penalty verdict pursuant to section 190.4, subdivision (e). ██ "In ruling on a verdict-modification application, the trial judge is required by section 190.4(e) to 'make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.' [Citations.] That is to say, [the trial judge] must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. [Citation.] And [the trial judge] must make that determination independently, i.e., in accordance with the weight he [or she] believes the evidence deserves. [Citation.]" (*People v. Marshall* (1990) 50 Cal.3d 907, 942 [269 Cal.Rptr. 269, 790 P.2d 676].) "[T]he trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's

independent judgment, the weight of the evidence supports the jury verdict. [Citations.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627], italics omitted.)

 Defendant first claims the trial court failed to consider the mitigating evidence of his impaired mental condition, falling into the error of assuming that section 190.3, factor (h) (whether his mental capacity was "impaired as a result of mental disease or defect") required the same level of proof as a verdict of legal insanity. (See discussion of this issue in pt. III.B.3., *ante*.) Not so. The trial court merely explained that it had already taken into account under section 190.3, factor (d) the evidence of defendant's mental problems (whether "defendant was under the influence of extreme mental or emotional disturbance") and had found such mental problems mitigating. The court previously had explained that it was "clear from all of the witnesses . . . that the defendant did suffer and does suffer from a mental disease or defect, and I do consider that to be in mitigation."

It is true the trial court stated section 190.3, factor (h) had not been "satisfied." Defendant strongly argues this conclusion necessarily reveals the trial court misunderstood the difference between the standard of proof at the sanity phase and that for section 190.3, factor (h). We disagree. Instead, it appears the trial court meant that it found the expert psychiatric evidence established defendant suffered from an "extreme mental . . . disturbance" (§ 190.3, factor (d)) but did not establish that defendant's "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect" (*id.*, factor (h)). That was not an unreasonable conclusion; despite the ample evidence of defendant's mental problems, he seemed to understand that what he did to Radford and Levoy was wrong.

Defendant next claims the trial court improperly failed to consider nonstatutory mitigating evidence under section 190.3, factor (k). Regarding factor (k), the court stated: "I don't think that there [is] any other[] [mitigating evidence] that I have not already considered in my previous discussion." The court later concluded: "the Court has considered *all of the evidence* and has taken into account and been guided by these factors, having heard, considered the arguments of counsel, and independently conclude and find that the aggravating circumstances do outweigh the mitigating circumstances, and it therefore is the Court's conclusion that the jury's findings and verdicts are not only supported by the weight of the evidence, but the Court in its own independent review *of all the evidence* finds the jury's verdicts and findings are consistent with the law and evidence." (Italics added.)

Defendant argues the trial court should have considered as mitigating his service in Vietnam, for which he received several commendations and

awards, the abusive childhood he endured, his record of good behavior in prison, the fact he cooperated with police, and the evidence he financially supported his family. He claims the court's failure to mention this evidence when addressing section 190.3, factor (k) indicated the court had failed to consider the evidence.

We denied essentially the identical claim in *People v. Arias, supra,* 13 Cal.4th 92. In that case, we explained the trial court, when ruling on a section 190.4, subdivision (e) motion, "was obliged only to provide a ruling adequate ' "to assure thoughtful and effective appellate review." ' [Citation.] Thus, it was not required to recount every detail of matters . . . it already deemed mitigating. Moreover, the court's ruling indicates its clear understanding of its duty to weigh all the aggravating and mitigating evidence. The court carefully set forth the evidence to which it assigned significant aggravating or mitigating weight. Under these circumstances, the failure to mention other specific matters in mitigation implies, not that they were overlooked or deemed legally irrelevant, but simply that the court found them insubstantial and unpersuasive." (*People v. Arias, supra,* at pp. 191-192.)

Accordingly, we find the trial court, in denying defendant's motion for modification of penalty under section 190.4, subdivision (e), did not breach any of his rights under the federal Constitution. We also conclude the trial court did not violate any statutory rights defendant may have under section 190.4. Finally, in light of these conclusions, we find defendant was not deprived of the effective assistance of counsel by defense counsel's failure to object or otherwise call the trial court's attention to the alleged error.

### 10. *Constitutional Challenges to the Death Penalty Law*

Defendant next raises several arguments that the state's death penalty law is unconstitutional under the state and federal Constitutions. As outlined below, we have addressed and rejected these claims in previous opinions, and defendant does not convince us we should revisit those decisions. Thus, defendant claims various of his constitutional rights were violated because the death penalty law, and the jury instructions implementing that law:

Permitted the jury to hear the underlying facts of a prior felony conviction (his conviction for the 1976 assault of Bonnie Brown) admitted as aggravating evidence. (*People v. Ray, supra,* 13 Cal.4th at p. 350; *People v. Stanley, supra,* 10 Cal.4th at pp. 818-819.)

Failed to inform the jury that the state bears the burden of persuasion at the penalty phase. (*People v. Kipp* (1998) 18 Cal.4th 349, 381 [75

Cal.Rptr.2d 716, 956 P.2d 1169]; *People v. Jackson, supra*, 13 Cal.4th at p. 1239.)

Failed to inform the jury it must unanimously find an aggravating factor exists before that factor may be considered. (*People v. Kipp, supra*, 18 Cal.4th at p. 381.)

Failed to inform the jury it must find aggravating circumstances outweigh mitigating circumstances and that death is an appropriate penalty beyond a reasonable doubt. (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Counsel was not ineffective for failing to request a reasonable doubt instruction at the penalty phase.

Failed to impose on the jury a standard of proof for the penalty phase. (*People v. Carpenter* (1997) 15 Cal.4th 312, 417-418 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Counsel was not ineffective for failing to request that the jury be instructed on some standard of proof at the penalty phase.

Failed to require the jury provide written findings. (*People v. Kraft, supra*, 23 Cal.4th at p. 1078; *People v. Williams, supra*, 16 Cal.4th at pp. 276-277.) Counsel was not ineffective for failing to request that the jury be required to return written findings at the penalty phase.

Failed to provide for intercase proportionality review. (*People v. Kraft, supra*, 23 Cal.4th at p. 1078; *People v. Williams, supra*, 16 Cal.4th at pp. 278-279.)

Prohibited consideration of mental or emotional disturbances as a mitigating factor unless such disturbances are "extreme." (*People v. Kraft, supra*, 23 Cal.4th at p. 1078; *People v. Williams, supra*, 16 Cal.4th at pp. 276-277.)

Failed to define the term "extreme" as used in section 190.3, factor (d). (*People v. Arias, supra*, 13 Cal.4th at pp. 188-189.)

Failed to clarify that "extreme mental disturbance" as used in section 190.3, factor (d) can be a mitigating circumstance only. (*People v. Ray, supra*, 13 Cal.4th at p. 359.)

Granted prosecutors "unbounded" discretion in deciding when to seek the death penalty. (*People v. Kraft, supra*, 23 Cal.4th at p. 1078; *People v. Williams, supra*, 16 Cal.4th at p. 278.)

Failed adequately to narrow eligibility for the death penalty. (*People v. Kraft, supra*, 23 Cal.4th at p. 1078; *People v. Sakarias* (2000) 22 Cal.4th 596, 632 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

Permitted the jury's consideration of nonstatutory aggravating circumstances. (*People v. Earp, supra,* 20 Cal.4th at p. 899; *People v. Sanchez* (1995) 12 Cal.4th 1, 79 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Counsel was not ineffective for failing to object to the jury instructions on this ground.

Permitted the jury to believe the absence of mental or emotional disturbance could be an aggravating factor. (*People v. Coddington, supra,* 23 Cal.4th at pp. 638-639; *People v. Scott, supra,* 15 Cal.4th at p. 1220 ["Although the absence of mitigation is not itself aggravating, the prosecutor may argue the evidence of mental state does not in fact mitigate"].)

Permitted the jury generally to believe that the absence of a mitigating factor could be an aggravating factor. (*People v. Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]; see *People v. Coddington, supra,* 23 Cal.4th at p. 639 ["the court is not required to instruct that the absence of a mitigating factor is not itself aggravating"].) Counsel was not ineffective for failing to object to the jury instructions on this ground.

Permitted the jury to believe defendant's future dangerousness could be an aggravating factor. (*People v. Jackson, supra,* 13 Cal.4th at p. 1242; *People v. Ray, supra,* 13 Cal.4th at p. 353.)

Prevented the jury from considering all relevant mitigating evidence because of the use of limiting modifiers such as "extreme" and "substantial."[29] (*People v. Box, supra,* 23 Cal.4th at p. 1217; *People v. Turner* (1994) 8 Cal.4th 137, 208 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

### 11. *Cumulative Effect of Errors*

Defendant finally contends the cumulative effect of the errors at his trial requires that we reverse the guilt, sanity and penalty judgments. We have identified only three errors, all of which were harmless individually: (1) the appointment of Dr. Cutting and Dr. Criswell to examine defendant for sanity when the only issue at the time was his competence to stand trial; (2) permitting the same psychiatrists to testify at the sanity phase; and (3) violating sections 977 and 1043 by permitting defendant voluntarily to absent himself from his trial. We have also explained that permitting Carol Bender to testify she had trouble serving defendant's mother with a subpoena, and giving a limiting instruction concerning the jury's consideration of the VESI videotapes, if error, were both harmless. Considering these matters together, we conclude their cumulative effect was minor. Accordingly, we reject the claim that the aggregate effect of these errors at defendant's trial requires reversal.

---

[29]For example, section 190.3, factor (g) asks "[w]hether or not the defendant acted under *extreme* duress or under the *substantial* domination of another person." (Italics added.)

## IV. CONCLUSION

We affirm the judgments of guilt, sanity, and penalty in their entirety.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied October 24, 2001.